[Nos. A086708, A087959, A089660. First Dist., Div. Two. Aug. 30, 2001.]

BERKELEY KEEP JETS OVER THE BAY COMMITTEE, Petitioner and Appellant, v.
BOARD OF PORT COMMISSIONERS OF THE CITY OF OAKLAND, Defendant and Appellant.

CITY OF SAN LEANDRO et al., Plaintiffs, v.
BOARD OF PORT COMMISSIONERS OF THE CITY OF OAKLAND, Defendant.

CITY OF ALAMEDA et al., Plaintiffs and Appellants, v.
BOARD OF PORT COMMISSIONERS OF OAKLAND, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.C., III.E., III.F., III.G., III.H., IV. and V.

**COUNSEL**

John R. Shordike; Shute, Mihaly & Weinberger, E. Clement Shute, Jr. for Petitioner and Appellant.

Carol A. Korade, City Attorney, David Brandt, Deputy City Attorney; McDermott, Will & Emery and Steven F. Pflaum for Plaintiffs and Appellants.

Steven R. Meyers, City Attorney; Meyers, Nave, Riback, Silver & Wilson, Andrea J. Sultzman, Rick W. Jarvis and Amrit S. Kulkarni for Plaintiffs City of San Leandro et al.

McCutchen, Doyle, Brown & Enersen, Stephen L. Kostka, Barbara J. Schussman, Peter S. Hayes, Geoffrey L. Robinson; Brecher & Volker, Joseph J. Brecher; and David L. Alexander for Defendant and Appellant.

**OPINION**

**RUVOLO, J.—**

I.

This appeal reviews the decision of the Board of Port Commissioners for the Port of Oakland (the Port Commissioners) for the City of Oakland to

certify the environmental impact report (EIR) analyzing the environmental consequences of the proposed Airport Development Plan (ADP) for the Metropolitan Oakland International Airport (the Airport). The ADP is a multifaceted, long-range expansion proposal for the Airport that will provide increased capacity for both air cargo and passenger operations.

The trial court issued a peremptory writ of mandate ordering the Port Commissioners to set aside approval and certification of the EIR until a supplement to the EIR was prepared and circulated that complied with the requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA).[1] The trial court held that the EIR prepared for the ADP violated CEQA by failing to analyze a reasonable range of alternatives, and by failing to evaluate the cumulative impacts of the ADP in combination with other reasonably foreseeable projects.

The judgment granting a peremptory writ of mandate is reversed in part and affirmed in part. We affirm the portion of the superior court's judgment directing that a revised EIR be prepared to include further discussion of project alternatives and cumulative impacts. However, we conclude that the EIR prepared for the ADP did not comply with CEQA in its treatment of several other critical issues. Specifically, the EIR (1) failed to analyze adequately the noise impacts from planned additional nighttime flights; (2) erred in using outdated information in assessing the emission of toxic air contaminants (TAC's) from jet aircraft; (3) failed to support its decision not to evaluate the health risks associated with the emission of TAC's with meaningful analysis; and (4) improperly deferred devising a mitigation plan for the western burrowing owl.

Because there are several significant environmental issues that have not been adequately addressed in the EIR's discussion of potential impacts from the project, a new supplemental EIR must be prepared, submitted for public review and comment, and certified in accordance with CEQA. We therefore direct that the trial court issue a new writ of mandate in accordance with the views expressed herein.

II.

A. *Project Overview*

The project site for the ADP comprises approximately 2,445 acres and is located in the southwestern portion of the City of Oakland in Alameda

---

[1]All undesignated statutory references are to the Public Resources Code.

County. To the north are the City of Alameda, San Leandro Bay, and Airport Channel; to the east are the cities of San Leandro and Oakland; and to the south and west is the San Francisco Bay.

The ADP is designed to reduce congestion, inconvenience, and delay at the Airport and to accommodate, at acceptable levels of service, anticipated growth in passenger and cargo activity through the year 2000.[2] The proposed passenger components of the ADP include consolidating the two existing terminals, adding 12 new gates, reconfiguring ticket counters, enlarging waiting and other public areas, and adding baggage-handling space. Roads on and near the Airport will be widened and reconfigured, and a new 6,000-space parking garage will be built. The ADP responds to the projected growth in cargo demand by expanding the Federal Express Metroplex, the United States Postal Service Airmail Distribution Center, the North Airport cargo facilities, and constructing a multitenant facility.[3]

While the ADP is only designed to accommodate activity expected in the year 2000, the EIR forecasted the highest level of aircraft operations that might occur through 2010 if activity at the Airport continues to grow at the same pace as in the early 1990's. The EIR projected that, with implementation of the ADP, the number of aircraft operations will increase from about 470,000 in 1994 to over 600,000 in 2000, and to over 800,000 in 2010. Thus, by 2010, approximately 2,200 aircraft will take off and land at the Airport each day.

The Port of Oakland (the Port), as lead agency under CEQA, prepared a draft EIR, studying the significant environmental effects of the ADP. The

---

[2]The EIR assumed that the ADP would be approved, constructed, and operational by 2000. After the EIR was completed and subjected to public review, it was clear that the EIR process and project construction could not possibly be accomplished by that date. Members of the public, noting the unrealistic time frame for the project, requested that the entire ADP be reevaluated "to occur within a realistic time frame and using an up-to-date baseline." The Port of Oakland responded: "[T]he Port has reviewed regularly changes in baseline information that could affect the discussion of significant impacts in the Draft EIS/EIR and has determined that such changes, where they have occurred at all, do not substantially affect the analysis presented in the Draft EIS/EIR."

[3]The ADP also includes an Airport Roadway Project. The Airport Roadway Project realigns and widens some of the road between the freeway and the Airport and extends a road across the Airport to the Bay Farm Island portion of the City of Alameda. Approval of the Airport Roadway Project is not an issue on appeal because the lower court's judgment allows the roadway project to proceed and no party has challenged that ruling.

draft EIR was published and made available for public review from September 10, 1996, to December 30, 1996.[4] The Port received over 500 comments on the draft document from public agencies, businesses, organizations, and individuals. Public hearings were held on November 6, 1996, at which written and oral comments were received. The comments ranged from one-page letters to multivolume comment reports. The Port was occupied for a full year in preparing written responses to the comments received and to completing modifications to the draft EIR.

On December 3, 1997, the Port issued a final EIR for review by interested persons and public agencies. The final EIR was comprised of 617 pages, plus another 2,612 pages in appendices, comment letters, and responses to comments. The final EIR identified the ADP's significant environmental effects. Significant impacts that can be mitigated to a less-than-significant level were found in each of the following areas: social, air quality, water quality, cultural resources, biotic communities, wetlands, flooding and floodplains, hazardous materials and waste, transportation and circulation, geology and seismicity, and public services and utilities. Significant and unavoidable impacts were found in each of the following areas: noise, air quality, hazardous materials and waste, and transportation and circulation.

On December 16, 1997, the Port Commissioners adopted Resolution No. 97376, certifying the final EIR and approving the ADP. Shortly thereafter, four writ petitions were filed in the superior court challenging the Port Commissioners' decision to certify the EIR and approve the project.

On February 2, 1999, the Alameda County Superior Court entered its judgment, granting a peremptory writ of mandate. The court found that the EIR was inadequate under CEQA because it failed to analyze several alternatives to the ADP that had been identified in the early stages of the environmental review process, and because it failed to evaluate the cumulative impacts of the ADP in combination with other reasonably foreseeable projects. Specifically, the trial court found that (1) two alternatives mentioned in a notice of preparation of the EIR should have been discussed in

---

[4]The draft document purports to fulfill all state CEQA and federal requirements under the National Environmental Policy Act of 1969, 42 United States Code section 4321 et seq., and makes numerous references to being a joint EIR/EIS prepared by the Port in conjunction with the Federal Aviation Administration (FAA). CEQA provides that when a project will require both an EIS (environmental impact statement) and an EIR, the lead agency "shall, whenever possible, use the environmental impact statement as [the] environmental impact report . . . ." (§ 21083.7.) However, according to the notice of review issued by the Port, the final document is solely an EIR under CEQA. Because the FAA did not participate in or approve the finalization of this document, we refer to it as simply an EIR.

the EIR (the "Air Passenger Dominant Alternative" and the "Air Cargo Dominant Alternative"); and (2) an analysis of the cumulative impacts of three potential future projects was required (a new runway, an extension of runway 11/29, and construction of a high-speed taxiway). The court rejected a host of other claims made with regard to the adequacy of the EIR.

A writ of mandate issued that conformed to these rulings, and which ordered the Port Commissioners to set aside approval and certification of the EIR until a supplement to the EIR was prepared and circulated that complied with the requirements of CEQA by containing an adequate analysis of project alternatives and cumulative impacts. The court also issued an injunction prohibiting the Port from taking any action to implement the ADP until it had fully complied with CEQA. Following briefing and hearing, the court issued an order jointly granting petitioners $180,000 in attorney fees.

The trial court's resolution of this controversy has spawned several appeals, which reach us after a somewhat serpentine procedural history. We first consider appeal No. A086708, which is composed of separate appeals by the City of Alameda and two citizens organizations, Berkeley Keep Jets Over the Bay Committee, and Citizens League for Airport Safety and Serenity (CLASS) (hereafter collectively referred to as petitioners).[5] Petitioners primarily argue that the EIR's project description failed to disclose the full magnitude of the project, and that the EIR did not fully address many significant environmental issues associated with the proposed expansion of the Airport's operations and facilities, including noise impacts, emission of toxic air pollutants, and adverse impacts on threatened species such as the burrowing owl. The Port cross-appealed, claiming the trial court erred in requiring a supplemental analysis of project alternatives and cumulative impacts.[6]

In appeal No. A089660, we review the trial court's order discharging the peremptory writ of mandate issued in appeal No. A086708. In appeal No. A087959, we review the court's order awarding petitioners $180,000 in attorney fees pursuant to Code of Civil Procedure section 1021.5, to be divided by stipulation or subsequent court order. Before we address the multitude of issues raised by each of the parties in appeal No. A086708, we review briefly the law that guides our resolution of these important issues.

---

[5]Although the City of San Leandro was one of the entities that challenged the Port Commissioners' certification of the EIR below, it was satisfied with the trial court's decision and did not appeal.

[6]When the matter was briefed, the Port elected not to pursue its cross-appeal from that portion of the court's judgment requiring a supplemental analysis of project alternatives.

## B. General Overview of CEQA and Standard of Review Relating to Claims that an EIR Omitted Relevant Information

Certain basic principles regarding the adequacy of an EIR are relevant to much of our discussion. The statutory scheme of CEQA rests on the fundamental requirement of section 21151 that "[a]ll local agencies shall prepare . . . an environmental impact report on any project that they intend to carry out or approve which may have a significant effect on the environment." The EIR serves to provide public agencies and the public in general with information about the effect that a proposed project is likely to have on the environment and to "[i]dentify ways that environmental damage can be avoided or significantly reduced." ▆▆ ▆▆ ▆ (Cal. Code Regs., tit. 14, § 15002, subd. (a)(2) (Guidelines).)[7] "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' [Citation.]" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].)

In addition to "provid[ing] public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment" (§ 21061), the EIR must "describe feasible measures which could minimize significant adverse impacts" and "describe a range of reasonable alternatives to the project." (Guidelines, §§ 15126.4, subd. (a)(1), 15126.6, subd. (a).) Among the alternatives, the report must evaluate "[t]he specific alternative of 'no project[.]' " (Guidelines, § 15126, subd. (e)(1).) These sections reflect the legislative policy "that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (§ 21002.)

To effectuate this policy, Public Resources Code section 21081 requires a public agency to make certain specific findings attesting to its consideration of the need for the mitigation measures identified in the EIR. The findings

---

[7]All references to the Guidelines are to the current CEQA Guidelines, which were revised in 1998, unless otherwise noted. (Cal. Code Regs., tit. 14, § 15000 et seq.) Where the current Guidelines differ significantly from the Guidelines in effect when the EIR was approved, the nature of the change will be noted and the superceded Guidelines govern. (See Guidelines, § 15007.) The Guidelines "are binding on all public agencies in California." (Guidelines, § 15000.) Our Supreme Court has stated that "[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA. [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

must be supported by substantial evidence on the record. (Guidelines, § 15091.) If the project has a significant effect on the environment, the agency may approve the project only upon finding that it has "[e]liminated or substantially lessened all significant effects on the environment where feasible" and that any unavoidable significant effects on the environment are "acceptable due to overriding concerns" specified in section 21081. (Guidelines, § 15092, subd. (b)(2)(A) & (B).)

"[T]he EIR is the heart of CEQA" and the integrity of the process is dependent on the adequacy of the EIR. (*County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) " 'An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . .' [Citations.] Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure. [Citations.]" (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 368 [7 Cal.Rptr.2d 307], quoting Guidelines, § 15151.)

The absence of information from the EIR " 'does not per se constitute a prejudicial abuse of discretion. [Citation.]' " (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 749 [22 Cal.Rptr.2d 618].) A prejudicial abuse of discretion occurs " 'if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 722 [32 Cal.Rptr.2d 704]; *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1117 [71 Cal.Rptr.2d 1]; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946 [91 Cal.Rptr.2d 66].)

In making that assessment, our Supreme Court has cautioned that a reviewing court is not to decide "whether the studies are irrefutable or whether they could have been better." (*Laurel Heights I, supra*, 47 Cal.3d at p. 409.) By the same token, the reviewing court is not to "uncritically rely on every study or analysis presented by a project proponent in support of its position. A clearly inadequate or unsupported study is entitled to no judicial deference." (*Id.* at p. 409, fn. 12.) "Our role here, as a reviewing court, is not to decide whether the board acted wisely or unwisely, but simply to determine whether the EIR contained sufficient information about a proposed project, the site and surrounding area and the projected environmental impacts arising as a result of the proposed project or activity to allow for an

informed decision . . . . [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at p. 718.)

In sum, the determination of EIR adequacy is essentially pragmatic. Whether an EIR will be found in compliance with CEQA involves an evaluation of whether the discussion of environmental impacts reasonably sets forth sufficient information to foster informed public participation and to enable the decision makers to consider the environmental factors necessary to make a reasoned decision. Preparing an EIR requires the exercise of judgment, and the court in its review may not substitute its judgment, but instead is limited to ensuring that the decision makers have considered the environmental consequences of their action.

The only role for this court in reviewing an EIR is to ensure that the public and responsible officials are adequately informed " 'of the environmental consequences of their decisions *before* they are made." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*), original italics.) There, our Supreme Court has described the standard of review in these cases: "In reviewing an agency's determination, finding or decision under CEQA, a court must determine whether the agency prejudicially abused its discretion. ([Pub. Resources Code,] § 21168.5.) 'Abuse of discretion is established if the agency has not proceeded in a manner required by law *or* if the determination or decision is not supported by substantial evidence.' (*Ibid.,* italics added.) The Guidelines further define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' (Guidelines, § 15384, subd. (a).)" (*Id.* at pp. 1132-1133, fn. omitted; see also §§ 21168, 21168.5.)

"In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' (*Topanga Association for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].)" (*Laurel Heights I, supra,* 47 Cal.3d at p. 393.) We may not overturn an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. Neither may we weigh conflicting evidence and determine who has the better argument. (*Ibid.*) "Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot,

guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Ibid.*)

With these principles in mind, we turn to the express concerns raised by petitioners, who contend the trial court's ruling—which was limited to the EIR's discussion of alternatives and cumulative impacts—failed to correct many other deficiencies in the EIR.

III.

### A. *Project Definition*

Petitioners claim the EIR's analysis of environmental impacts is premised on an inadequate project description that severs portions of the Port's on-site expansion plans, including the construction of a new runway, a new high-speed taxiway, and an extension of runway 11/29 from the ADP's project description.[8] As such, they contend this is a classic case of "segmentation," in which an agency splits a large project into small pieces in order to avoid detailed environmental review. (See *Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1171 [227 Cal.Rptr. 688].) They argue, "Because the Port did not proceed in the manner required by law when it excluded the new runway and the runway extension from the [final EIR's] project description and then analyzed environmental impacts based upon its truncated project description, the writ of mandate and judgment should be amended to require the Port to prepare a revised EIR . . . ."

In support of this contention, petitioners point to draft planning documents, prepared over a decade ago, which evaluate the feasibility of adding a new runway as part of an effort to develop a 20-year master plan for the Airport, a plan which the Port never completed or adopted. Petitioners also emphasize that the Port, at one time, intended to include the high-speed taxiway and the extension of runway 11/29 as part of the proposed project described in the EIR. However, the Port ultimately decided not to proceed with these projects. The Port explains that its decision "was influenced in part by the fact that continued efforts toward a longer range plan presented significant institutional and political problems and stirred a great deal of controversy." In the end, the Port decided to focus "on those improvements that are clearly needed in Phase I. These include terminal

---

[8]A longer runway would (1) enable cargo planes on long transoceanic flights to take off fully loaded, rather than partially loaded as they do now; (2) improve operational safety and efficiency; and (3) speed up runway maintenance by making it easier to close a portion of the runway. The purpose of the high-speed taxiway is to increase efficiency during certain weather conditions when landings are from the north rather than from the south.

expansion, new terminal support facilities, air cargo expansion, miscellaneous airfield improvements, general aviation facilities development, and improved instrumentation."

■ There is no dispute that CEQA forbids "piecemeal" review of the significant environmental impacts of a project. This rule derives, in part, from section 21002.1, subdivision (d), which requires the lead agency—in this case, the Port—to "consider[] the effects, both individual and collective, of all activities involved in [the] project." It has been recognized that " '[a] curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance. An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.' [Citation.]" (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1023 [280 Cal.Rptr. 478], original italics; *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 201 [55 Cal.Rptr.2d 625].)

Under the Guidelines, the term "project" is defined as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, subd. (a).) At the other end of the spectrum, long-range planning proposals are exempt from EIR requirements: "A project involving only feasibility or planning studies for possible future actions which the agency, board, or commission has not approved, adopted, or funded does not require the preparation of an EIR . . . ." (Guidelines, § 15262.)[9]

Consequently, like so many other matters in life, timing in EIR preparation is essential. It is desirable that "EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late

---

[9]Despite petitioners' argument to the contrary, nothing in section 15165 of the Guidelines suggests that a proposal not deemed a part of a larger undertaking which an agency is not ready to pursue, and may never pursue, be added to an EIR on an existing project that the agency is proposing to approve. "Where individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the lead agency shall prepare a single program EIR for the ultimate project as described in Section 15168. . . ." (Guidelines, § 15165.) The fact that the Guideline refers to "projects . . . to be undertaken" confirms that it is intended to apply only to project components that an agency is proposing to implement. It does not extend to preliminary plans, feasibility studies or contemplated development the agency is not proposing to approve or undertake. (See also Guidelines, §§ 15167 [staged EIR's], 15168 [program EIR's].)

enough to provide meaningful information for environmental assessment. . . ." (Guidelines, § 15004, subd. (b); see also *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 282 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Stand Tall on Principles v. Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 780 [1 Cal.Rptr.2d 107]; *Mount Sutro Defense Committee v. Regents of University of California* (1978) 77 Cal.App.3d 20, 35 [143 Cal.Rptr. 365].) Environmental review which comes too late runs the risk of being simply a burdensome reconsideration of decisions already made and becoming the sort of *"post hoc* rationalization[] to support action already taken," which our high court disapproved in *Laurel Heights I, supra,* 47 Cal.3d at page 394 (original italics).

Petitioners primarily rely on *Laurel Heights I, supra,* 47 Cal.3d 376, to support their argument that the appropriate time to introduce environmental considerations related to the construction of a new runway, new high-speed taxiway, and extension of runway 11/29 into the decisionmaking process was when the EIR was being prepared. Because *Laurel Heights I* is the leading case in determining to what extent an EIR must consider potential future expansion of existing proposals, we consider it in some detail.

The project in *Laurel Heights I* was defined in the EIR as " 'mov[ing] the School of Pharmacy basic science research units from the [University of California, San Francisco (UCSF)] Parnassus campus to Laurel Heights.' " (*Laurel Heights I, supra,* 47 Cal.3d at pp. 389, 393.) The building at Laurel Heights was located in a mixed residential and commercial neighborhood. (*Id.* at p. 388.) It was purchased by the Regents in 1985, and consisted of approximately 354,000 square feet, of which only 100,000 was then available for relocation of the UCSF School of Pharmacy research units. The rest of the building was occupied by the California Department of Transportation (Caltrans) under a lease that was to expire in 1990, with an option for an additional five years. (*Id.* at p. 393.) However, the Regents acknowledged that UCSF would occupy the entire building when the Caltrans space became available, with the only uncertainty being the precise use of the additional space. (*Id.* at pp. 396-397.) Proposals for the expansion included development of " 'a biomedical research facility, with cross disciplinary programs from all UCSF schools,' " as well as relocation of the UCSF's Office of the Dean. (*Id.* at pp. 396-397.) The Laurel Heights Neighborhood Improvement Association, Inc., filed a petition for writ of mandate alleging, among other things, that the EIR for the project was inadequate because it failed to discuss the various proposals for expansion once the additional space became available and the environmental effects of those activities. (*Id.* at pp. 387, 389.)

After framing the central issue for decision as "what circumstances require consideration in an EIR of future action related to the proposed project" (*Laurel Heights I, supra*, 47 Cal.3d at p. 395), the Supreme Court in *Laurel Heights I* concluded as follows: "We hold that an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (*Id.* at p. 396.)

This standard, the *Laurel Heights I* court explained, "is consistent with the principle that 'environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' [Citation.] The standard also gives due deference to the fact that premature environmental analysis may be meaningless and financially wasteful. Under this standard, the facts of each case will determine whether and to what extent an EIR must analyze future expansion or other action." (*Laurel Heights I, supra*, 47 Cal.3d at p. 396, quoting *Bozung v. Local Agency Formation Com., supra*, 13 Cal.3d at pp. 283-284.)

Applying the foregoing principles, the *Laurel Heights I* court found it "indisputable that the future expansion and general type of future use is reasonably foreseeable," and irrelevant that the Regents had not yet decided "*precisely* how they will use the remainder of the building." (*Laurel Heights I, supra*, 47 Cal.3d at pp. 396-397, original italics.) The Supreme Court held that the EIR was inadequate in its failure to discuss the anticipated future uses of a planned research facility, and the likely environmental impacts of those uses. (*Id.* at p. 399.)

On a cautionary note, the court stated: "We do not require prophecy. The Regents are not required by our decision to commit themselves to a particular use or to predict precisely what the environmental effects, if any, of future activity will be. *Nor do we require discussion in the EIR of specific future action that is merely contemplated or a gleam in a planner's eye.* To do so would be inconsistent with the rule that mere feasibility and planning studies do not require an EIR. (Guidelines, § 15262.)" (*Laurel Heights I, supra*, 47 Cal.3d at p. 398, italics added.)

We believe there are factors present in the *Laurel Heights I* case that distinguish it from the case before us. First, the evidence cited in *Laurel*

*Heights I* as creating "reasonable foreseeability" that the future expansion would occur does not compare favorably to the evidence relied on by petitioners here. In *Laurel Heights I,* evidence that future expansion was "reasonably foreseeable" included an acknowledgment in the draft EIR that the university would occupy the entire facility when the remaining 254,000 square feet became available. (*Laurel Heights I, supra,* 47 Cal.3d at p. 393.) The university's plans were sufficiently definite that it estimated the number of faculty, staff, and students who would occupy the building before (460) and after (860) the expansion. (*Id.* at p. 396.) The final EIR also referred to the future expansion as a certainty, as did newsletters, minutes of the planning committee, and correspondence between the pharmacy dean and the chancellor. These documents also described with specificity how the additional space would be used. (*Id.* at p. 397.) The court concluded: "In short, there is telling evidence that the University, by the time it prepared the EIR, had either made decisions, or formulated reasonably definite proposals as to future uses of the building. At a minimum, it is clear that the further expansion and the general types of future activity at the facility are reasonably foreseeable." (*Ibid.*)

By contrast, here the only evidence petitioners offer to support their assertion that the plans for a new runway are inseparable from the whole of the Airport's master plan for expansion appear in dated, long-range planning documents of the Port. With respect to a high-speed taxiway and extension of runway 11/29, petitioners rely on documents showing that these projects were deleted from the proposed ADP very early in the planning process. However, to conclude that these documents irreversibly committed the Port to a particular course of action would be to ignore the fact that large public transportation projects, such as the one involved here, are in the planning and development stage over a long period of time and customarily undergo many changes in design and scope before they are actually built. In reviewing the ADP's project definition, we are mindful that planning officials need flexibility to allow for modifications without being found committed to projects simply being contemplated in preliminary planning documents.

In essence, these runway projects existed only as concepts in long-range plans that were subject to constant revision. The record is silent with regard to any meaningful planning, decisionmaking, or any other activity by the Port moving forward with implementation of any such long-range plans. These are simply statements that at some undefined point in the future, the Port might try to undertake these projects. It is, of course, not necessary that plans for future use be final, or that the precise details of the future use be known, before an analysis of environmental impacts are required. (*Laurel*

*Heights I, supra*, 47 Cal.3d at p. 398; see also *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1338 [232 Cal.Rptr. 507].) However, the mere fact that a lead agency acknowledges that it contemplates such a long-range goal is not, by itself, sufficient to conclude that it is a "reasonably foreseeable consequence of the initial project." (*Laurel Heights I, supra*, at p. 396.)

Furthermore, the result in *Laurel Heights I* turned on the fact that occupying the rest of the building was *linked to* occupying the initial 100,000 square feet, in that the expansion would fulfill the Regents' stated planning objectives. The record reveals that the various runway projects are not similarly "linked" to the ADP either functionally or as part of the Port's concrete planning objectives for the airport.

As an example, the record fully supports the Port's assertion that the existing runways at the airport are operated below capacity and can accommodate the Port's worst-case long-term operation forecasts at least through the year 2010. In fact, twice as many flights could be accommodated on the existing runway system. Thus, the ADP does not depend on a new runway and would be built whether or not runway capacity is ever expanded. As the Port explained: "There is no way to foresee whether worst-case long term projections will be reached by 2010, or some number of years later. Future demand for air service out of Oakland obviously will be affected by a variety of factors which cannot be predicted, such as overall market demand, the availability of expanded capacity at the San Francisco and San Jose airports, development of high speed rail service within the state and technological changes affecting business travel patterns."

On this record, the stated long-range goal of expanded runway capacity is entirely speculative, and only "a gleam in a planner's eye." (See *Laurel Heights I, supra*, 47 Cal.3d at p. 398.) Therefore, failure to analyze a new runway, the high-speed taxiway, and runway extension doesn't violate the underlying policy against "piecemealing," because the facts do not support the conclusion that these contemplated long-range projects are a reasonably foreseeable consequence of the project under review. The EIR's project description was adequate.

Petitioners remind us that the EIR treated the extension of runway 11/29 and construction of a high-speed exit taxiway as "reasonably anticipated future projects" for purposes of assessing potential cumulative impacts of the proposed ADP in 2010. (Former Guidelines, § 15130, subd. (b)(1)(A); see current Guidelines, § 15355, subd. (b) [discussion of cumulative impacts limited to past, present, and "probable future projects"].) However, they

were discussed in the EIR's cumulative impact analysis because they were explored in the past, and the Port might *foreseeably* pursue them again at some point in the future.[10] By law, therefore, the runway work must have been included in the EIR's cumulative impacts analysis. However, this requirement does not mandate that all *possible* future projects had to be included in the current ADP project description.

Similarly, because the extension of runway 11/29 and the high-speed exit taxiway could proceed independently and be implemented by 2010, they were included in the analysis of the EIR's no-project alternative in 2010. We reject petitioners' related argument that "[b]y including the future extension of Runway 11/29 at MOIA in its analysis of the no project alternative, the [final EIR] indisputably fails to analyze the effects of the property remaining in its existing state." CEQA requires that the EIR's no-project alternative address existing conditions as well as what would reasonably be expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services. (Guidelines, § 15126.6, subd. (e)(2).) As succinctly explained in *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 911 [100 Cal.Rptr.2d 173], "[t]he existing conditions *supplemented by a reasonable forecast*, are characterized as the no project alternative." (Italics added.) The "no project" and project description requirements operate independently of one another, and impose requirements using different threshold tests. Thus, the inclusion of the extension of runway 11/29 in its discussion of the no-project alternative did not per se also obligate that it be incorporated as part of the ADP project description.

B. *Toxic Air Contaminants*

Petitioners next contend the EIR failed to (1) utilize the best available data to assess the increased emission of TAC's from airplane engines; (2) analyze meaningfully the health risks associated with the emission of TAC's; and (3) discuss adequately the ADP's inconsistency with the state implementation plan, which contains the strategy to be used by the State of California to make sure that national ambient air quality standards will be met. (See 42 U.S.C. § 7410.)

Because the Airport expansion will result in a dramatic increase in the number of aircraft operations, a concomitant increase in air pollutants is

---

[10]The trial court's judgment granting the writ of mandate finds this portion of the EIR deficient and requires a more complete discussion of the cumulative impacts generated by the extension of runway 11/29, and the construction of a high-speed taxiway. The court's ruling also requires the EIR to discuss cumulative impacts relating to a new runway. The Port has filed a cross-appeal from this ruling, claiming that the EIR's discussion of cumulative impacts was adequate. We will discuss the Port's cross-appeal in a later section of this opinion.

expected. The exhaust from aircraft engines and ground support equipment contains many TAC's. The Port describes TAC's as "a fractional component of the reactive organic gases that are released when any fuel is burned." TAC's are emitted into the air and dispersed into adjacent areas whenever aircraft idle, taxi down the runway, take off and land, and whenever group support equipment service these aircraft at the gates. The TAC's that have been detected in aircraft exhaust include acetaldehyde, benzene, 1,3-butadiene, benzo(a)pyrene, acrolein, and styrene.

1. *The EIR's Use of the 1991 Speciation Profile to Estimate TAC's*

The final EIR acknowledged that TAC's associated with airport operations would increase with the contemplated airport expansion. Specifically, expanded operations at the Airport will result in increased levels of numerous TAC's including acrolein, benzene, chlorobenzene, formaldehyde, and xylenes. The EIR also expressly conceded, *"TACs may cause both carcinogenic and adverse noncarcinogenic health effects."* (Italics added.)

The EIR estimated TAC emissions from jet aircraft for the years 2000 and 2010 based on a speciation profile contained in a document entitled Identification of Volatile Organic Compound Species Profiles (2d ed.1991), published by the California Air Resources Board (CARB) (profile #508 or the 1991 profile). Using this speciation profile, various organic compounds emitted from airplane engines were computed. In addition, the EIR compared the estimated increase in countywide TAC emissions forecast to occur under the ADP with the emissions forecast for the no project alternative.

Notwithstanding these analyses, the EIR concluded that the environmental effects of TAC increases due to the ADP are unknown because there is no approved, standardized protocol for determining the risks associated with mobile-source TAC's, such as aircraft, and there are no significance criteria associated with mobile-source emission of TAC's.

The EIR then considered mitigation of TAC's. The Port's air quality experts determined that TAC emissions associated with the ADP would be reduced through the nine mitigation measures established for criteria pollutants[11] because those measures would reduce organic gas emissions, of which TAC's are a fractional component. These proposed mitigation measures were limited to efforts to control emissions of ground service equipment, to

---

[11]Criteria pollutants are six pollutants listed in the Clean Air Act that are regulated by the Environmental Protection Agency (EPA) because of their health and/or environmental effects. They are nitrogen dioxide, sulfur dioxide, carbon monoxide, ozone, particulate matter, and lead.

install ground power equipment at new gates, to encourage ground transportation systems management, to purchase emissions credits to offset emissions from stationary sources, and to ensure that required permits are obtained from the Bay Area Air Quality Management District (BAAQMD). However, once again the EIR concluded that, "[a]s there are no standards of significance for mobile-source TAC emissions, the significance of this impact after mitigation is unknown."

At the time the EIR was written, the 1991 profile was CARB's most recently published profile. After the draft EIR was circulated for public review and comment, the use of this speciation profile was criticized as "outdated" in a comment letter from an expert in air quality analysis, Dr. J. Phyllis Fox. Dr. Fox explained that this profile was no longer used by CARB and that it had been replaced by a 1994 speciation profile (profile #586 or the 1994 profile), which is the average of three profiles published by the EPA.

Dr. Fox provided data indicating that the TAC emissions from the project would substantially increase if CARB profile #586 were used to estimate emissions from jet aircraft. For example, relying on the 1991 profile, the EIR reported that jet aircraft exhaust contains only two types of TAC's: benzene and xylene. However, the analysis conducted by Dr. Fox using the 1994 profile measures jet aircraft exhaust for six other TAC's (acetaldehyde, acrolein, 1,3-butadiene, formaldehyde, propylene and toluene), each of which can cause cancer or other severe health problems.

In reaction to Dr. Fox's public comment on the draft EIR, the Port published a response claiming that CARB profile #586 should not be used to estimate toxic emissions because CARB had not yet published that newer profile. Furthermore, citing a 1997 conversation with Paul Allen, an air pollution research specialist with CARB, the Port made the following statement: "CARB staff has expressed concern regarding the accuracy of some of the particular compounds contained in specifies [sic] profile #586 . . . . CARB has not determined what speciation profile will be included for jet exhaust when it releases its third edition of the reference manual cited above for public review sometime next year."

A declaration from Paul Allen was then submitted in connection with petitioners' legal challenge below to the final EIR.[12] In his declaration, Mr.

---

[12] We take judicial notice of Mr. Allen's declaration even though it was not part of the administrative record at the time the Port approved the project and certified the

Allen corrects the misleading impression given in the Port's response to public comments by averring: "On November 7, 1997, I spoke with [a Port representative]. He said that he was calling about the EIR for the Oakland airport expansion. He asked about speciation profile #586 for jet exhaust. *I told him that, in my opinion, speciation profile #586 is the best profile available*. I told him that the fraction for formaldehyde seemed high, but not necessarily inaccurate. I did not say that I doubted the overall accuracy of speciation profile #586. *I did say that the older species profile #508 should not be used to characterize jet exhaust speciation. . . .* Although profile #586 is based on data published by the [EPA], it has not been adopted by CARB for use in the VOC speciation manual. However, *the CARB staff believe that this profile is the most accurate characterization of jet exhaust available*." (Italics added.)

The record also contains a letter dated December 15, 1997, from Linda C. Murchison, chief of CARB's emission inventory branch. A copy of this letter was submitted to the Port Commissioners *prior* to certification of the final EIR. In pertinent part, the letter stated: "The Port of Oakland used profile #508 for the speciation of the organic gases from jet exhaust. Profile #508 is contained in a report published by the California Air Resources Board (CARB) in 1991. Because organic gas speciation profiles are being continually updated and improved, we routinely encourage the use of the best information available for the evaluation of emissions of toxic air contaminants. For jet exhaust, we believe that the best data available are the EPA 1097, 1098 and 1099 profiles contained in the 'Air Emissions Species Manual' EPA-450/2-88-003a. The CARB profile #586 is an average of the three EPA profiles. *We believe that profile #586 is a more accurate and comprehensive profile of the organic species contained in jet exhaust than what is contained in profile #508*." (Italics added.)

■ Therefore, in reply to public criticism that the EIR failed to use the most recent CARB speciation profile in estimating TAC emissions from jet aircraft, the Port created the misleading impression that a CARB official had discouraged the Port from utilizing speciation profile #586 because it had not yet been officially adopted by CARB and that CARB staff had questions about the accuracy of its methodology. The omission of the CARB official's opinion that "the older species profile #508 *should not be used to character-ize jet exhaust speciation*" and that speciation profile #586 "*is the most accurate characterization of jet exhaust available*" is a serious one, and is such as to prevent a decisionmaker and the public from gaining a true

EIR. (*Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1621 [45 Cal.Rptr.2d 688].)

understanding of one of the most important environmental consequences of increasing the number of flights.[13]

The Port raises the illusory argument that the Port Commissioners, in fact, had "the opportunity to consider emissions data from both the official and draft speciation profiles in making its decision to approve the EIR." For support it refers us to Dr. Fox's comment letter in which she questioned the Port's reliance on CARB's 1991 speciation profile #508. As we have noted, Dr. Fox recalculates TAC emissions using CARB's 1994 speciation profile #586, which indeed shows an increase in TAC emissions far greater than reported in the draft EIR. But in making its argument, the Port fails to point out that Dr. Fox's views were perfunctorily discredited in the Port's published response to her letter without any contrary analysis being made by the Port.

For these reasons, the use in the final EIR of data extrapolated from CARB's 1991 speciation profile #508 for measuring aircraft emission of TAC's did not meet the standard of "a good faith effort at full disclosure" required by CEQA. (Guidelines, § 15151.) " ' "[W]here comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response.*" ' " (*Cleary v. County of Stanislaus* (1981) 118 Cal.App.3d 348, 357 [173 Cal.Rptr. 390], original italics.) By using scientifically outdated information derived from the 1991 profile, we conclude the EIR was not a reasoned and good faith effort to inform decisionmakers and the public about the increase in TAC emissions that will occur as a consequence of the Airport expansion.

## 2. *Failure to Prepare Health Risk Assessment*

In addition to challenging the Port's quantification of TAC's using the 1991 speciation profile, petitioners also claim the Port failed to assess the health effect of TAC's from mobile sources on persons who live in close proximity to the Airport. In response to these concerns, the final EIR simply stated that the public health impact of the TAC emissions was "unknown."

To support this conclusion, the EIR made the following claims: "There is no approved, standardized protocol for assessing the risk associated with

---

[13]We also note that this court may properly be skeptical as to whether the EIR's myriad environmental conclusions have a substantial basis in fact in light of the overwhelming evidence that, in this particular instance, the Port chose simply to ignore and then to mischaracterize the view of CARB, the agency having the pertinent expertise. (See *Sierra Club v. United States Army Corps of Eng.* (2d Cir. 1983) 701 F.2d 1011, 1030.)

mobile source emissions of TACs, as there is for stationary-source emissions . . . . Furthermore, there is no standard for evaluating the significance of the risk associated with mobile-source emissions of TACs. Therefore, while the potential risk associated with mobile-source TAC emissions can be qualitatively discussed and can be considered by decision makers, a formal determination of the significance of the impact would be speculative and would not be based on accepted scientific principles or methodologies. The significance of this impact is thus considered unknown."

Voluminous documentary evidence was submitted to the Port supporting the assertion that an approved and standardized protocol did exist which would enable the Port to conduct a health risk assessment. For instance, the Port was cited to eight studies performed by the EPA on TAC emissions from mobile sources, including an EPA study of TAC emissions generated from aircraft and related vehicular sources at Midway Airport in southwest Chicago.

The Port was also referred to a study prepared by Environmental Science Associates contained in the EIR for the San Jose International Airport. Environmental Science Associates is the same consulting firm that prepared the EIR in this case. In that document, the EIR relied upon an evaluative methodology in determining that emissions from the San Jose project would result in a significant effect on the environment if they caused a net increase of more than one percent of countywide mobile-source emissions.

At the public hearing prior to certification of the final EIR, the Port was also provided with a letter from an environmental consultant who was in the process of performing a study quantifying the exposure and associated risk from toxic compounds generated from both mobile and fixed sources at the Santa Monica Municipal Airport. The letter set out in great detail the regulatory guidance the consultant has received from numerous agencies, including the EPA's Office of Mobile Sources as well as the Office of Air Quality Planning and Standards.

The consultant explained he had adopted the Industrial Source Complex Short Term methodology used by the EPA in its study of TAC emissions at Midway Airport in southwest Chicago for assessing the probability of adverse health effects from toxic emissions at the Santa Monica Airport. After setting out all of the technical aspects of the methodology, the consultant touted the Midway study as offering "a robust architecture with a unique level of refinement whereby the user is allowed the flexibility to program detailed source and operational profiles that effectively characterize

the downwind extent of contaminant emissions generated from the airport." The letter concludes by stating, "[A]n approved and standardized protocol does exist to permit the applicant to conduct an HRA [human health risk assessment]. It is clear that the process of risk assessment is well-defined and not simply limited to 'stationary sources' as suggested by [the Port]. In addition, significance criteria for toxic exposure is [*sic*] also readily available."

In addition, consultants retained by petitioners prepared a sample health risk assessment to assess the significance of exposure to increases in toxic emissions from aircraft and ground support equipment exhaust. Their work contained detailed tables and maps and was complemented by narrative explanations of the reasons that certain methodologies were chosen and the conclusions reached. This sample health risk assessment, which was submitted to the Port prior to certification of the EIR, indicated that off-site health impacts of the project will be significant and would increase the incidence of cancer and respiratory disease in residential neighborhoods around the airport and among employees at the airport itself.

While comments on the draft EIR should have alerted the Port to a need to consult with or, at a minimum, confirm its views with pertinent public agencies, the text of the final EIR contains virtually no reference to any material supplied by the public challenging the draft EIR's conclusion that no methodology or standards of significance existed for assessing the health risk from TAC exposure. In essence, it simply repeats the generic statement throughout the EIR's text that no adequate analytical tools are currently available for performing a health risk assessment for aircraft emissions. In embracing this conclusion, the Port cites a single sentence from the FAA's Emissions and Dispersion Modeling System released to the public in April 1997, which states that hazardous air pollutants (i.e. TAC's) are not included in the emissions inventory or dispersion analysis because " 'the data required to include these emissions is simply not available and in most cases there is no approved methodology for considering these pollutants.' "

The Port also relied on a letter from BAAQMD, which was received during the early scoping stage before the draft EIR was released for public comment (Guidelines, §§ 15082-15083) which did not take issue with the Port's characterization of the impact from TAC emissions as "unknown." However, the manager of the BAAQMD's Air Toxic Evaluation Section, Brian Bateman, was contacted by petitioners and was quoted as stating that the significance criteria in the BAAQMD CEQA Guidelines and the California Air Pollution Control Officers' Association (CAPCOA) Risk Assessment Guidelines apply to mobile sources. In a document submitted at the

public hearing before the final EIR was certified, he was quoted as stating, " 'these guidelines are generally applicable to any source, but special considerations in the area of dispersion modeling apply to mobile sources.' " Mr. Bateman further indicated "that the CAPCOA guidelines are applicable to airports and that it is technically feasible to perform a health risk assessment for an airport. He stated that the preparation of risk assessment for an airport 'is certainly a doable exercise from a technical standpoint. You can't argue that it cannot be done.' "[14]

The Port has not cited us to any reasonably conscientious effort it took either to collect additional data or to make further inquiries of environmental or regulatory agencies having expertise in the matter. These failures flout the requirement that the lead agency consult "with all responsible agencies and with any other public agency which has jurisdiction by law over natural resources affected by the project . . . ." (§ 21080.3, subd. (a).) At the very least, the documents submitted by the public raised substantial questions about the project's effects on the environment and the unknown health risks to the area's residents. When this matter was argued before the superior court, the Port's lawyer indicated that the omission of a health risk assessment should be excused because "there is no methodology universally accepted as to what's significant." Alternatively, in the absence of these efforts, the Port has not offered any justification why more definitive information could not have been provided.

The fact that a single methodology does not currently exist that would provide the Port with a precise, or "universally accepted," quantification of the human health risk from TAC exposure does not excuse the preparation of any health risk assessment—it requires the Port to do the necessary work to educate itself about the different methodologies that *are* available. The Guidelines recognize that "[d]rafting an EIR . . . involves some degree of forecasting. While foreseeing the unforeseeable is not possible, *an agency must use its best efforts to find out and disclose all that it reasonably can.*" (Guidelines, § 15144, italics added.) "If, *after thorough investigation,* a lead agency finds that a particular impact is too speculative for evaluation, the

---

[14]On petition for rehearing, the Port contends that this document, as well as the other documents received at the public hearing on the certification of the final EIR, was submitted too late in the environmental review process to be considered. However, it has been held that objections are timely raised *anytime* before certification of the final EIR. (*Galante Vineyards v. Monterey Peninsula Water Management Dist., supra,* 60 Cal.App.4th at pp. 1119-1121 [petitioners could maintain action despite their failure to participate in public comment period for second supplemental draft EIR because they raised concerns before certification of final EIR].) In any event, in our case, the material submitted during the public hearing on the certification of the final EIR only supplemented comments already made on the draft EIR and did not raise any new issues.

agency should note its conclusion and terminate discussion of the impact." (Guidelines, § 15145, italics added.)

We also find unpersuasive the Port's argument that the absence of a health risk assessment can be excused because the Port Commissioners, in approving the EIR, found that the effect of TAC's would be significant but that overriding considerations warranted proceeding with the project anyway. This approach has the process exactly backward and allows the lead agency to travel the legally impermissible easy road to CEQA compliance. *Before* one brings about a potentially significant and irreversible change to the environment, an EIR must be prepared that sufficiently explores the significant environmental effects created by the project. The EIR's approach of simply labeling the effect "significant" without accompanying analysis of the project's impact on the health of the Airport's employees and nearby residents is inadequate to meet the environmental assessment requirements of CEQA.

In summary, the defects disclosed by the record in the EIR's treatment of TAC's are substantial. The Port's response fell far short of the "good faith reasoned analysis" mandated by CEQA for responding to significant conflicting information generated by the public. (*Laurel Heights II, supra,* 6 Cal.4th at p. 1124; *Cleary v. County of Stanislaus, supra,* 118 Cal.App.3d at p. 358.) Much information of vital interest to the decision makers and to the public pertaining to toxic air contamination was simply omitted. In other instances, the information provided was either incomplete or misleading. The dispute in this regard goes beyond a disagreement of qualified experts over the reasoned conclusions as to what the data reveals. The EIR failed to acknowledge the opinions of responsible agencies and experts who cast substantial doubt on the adequacy of the EIR's analysis of this subject. The conclusory and evasive nature of the response to comments is pervasive, with the EIR failing to support its many conclusory statements by scientific or objective data. These violations of CEQA constitute an abuse of discretion. The Port must meaningfully attempt to quantify the amount of mobile-source emissions that would be emitted from normal operations conducted as part of the ADP, and whether these emissions will result in any significant health impacts. If so, the EIR must discuss what mitigation measures are necessary to ensure the project's conformance with all applicable laws, ordinances, standards, and regulations related to public health protection.

C. *Consistency with the State Implementation Plan\**

. . . . . . . . . . . . . . . . . . . . . . . . .

\*See footnote, *ante,* page 1344.

D. *Noise Impacts*

 Petitioners next contend that the EIR failed to address adequately the potential disturbance to area residents resulting from increased nighttime air cargo operations. Specifically, they claim the EIR omitted significant information about the ADP's potential interference with sleep, including physiological response and annoyance from increased nighttime over-flights.[16] We conclude that this contention has merit.

1. *Environmental Conclusions Reached in the EIR About Noise Impacts Resulting from the Airport Expansion*

The ADP responds to the anticipated growth in air cargo demand by proposing to construct a Federal Express Metroplex, air cargo facilities for Burlington Air Express and Emery Worldwide Freight, and a multitenant air cargo sorting and administrative office. The ADP also proposes to expand the United States Postal Service handling facilities. With this expansion would come an accompanying projected increase in aircraft operations. As already noted, the EIR projected that, with the implementation of the ADP, annual aircraft operations will increase from about 470,000 in 1994 to over 600,000 in the year 2000, and to over 800,000 in 2010. Moreover, once the ADP is fully implemented in 2010, there would be almost a threefold increase in the number of flights attributable to air cargo operations. Specifically, air cargo operations are projected to increase from 1994 levels of 50,426 flights to 146,144 flights in 2010.

The EIR recognized that air cargo activity generally takes place during the noise-sensitive nighttime hours: "The vast majority of commercial nighttime operations at [the Airport] are air cargo operations. Air cargo carriers conduct many of the aircraft operations at nighttime for business reasons, such as providing overnight and faster delivery of their customers' cargo." Although the exact number of nighttime flights directly attributable to the implementation of the ADP is not consistently defined in the EIR, one document generated by the Port indicated that during the year 2010, at least 65,000 additional nighttime flights are expected at the Airport annually, 27,000 of which would result from the ADP. These figures are used to support petitioners' statement that by 2010, there will be an additional 178 nighttime flights each day, 73 of which would be directly attributable to the expansion in the air cargo business as described in the ADP.

---

[16]Noise interference with human communications is also mentioned by petitioners, although clearly the focus of concern has been, and is, on the impact the increase in overnight cargo flights will have on sleep patterns of residents in the neighboring communities.

The EIR studied the aviation noise that would be generated from the increased passenger and cargo flights resulting from implementation of the ADP using a cumulative noise descriptor called the Community Noise Equivalent Level (CNEL). The CNEL is the 24-hour average sound level, in decibels, obtained from the accumulation of all sound sources. The CNEL calculates the total sound exposure, in decibels, at a given location and then divides the total by 24 hours to derive an average. To this is added 10 decibels to sound levels in the night from 10:00 p.m. to 7:00 a.m., and the addition of 5 decibels to sound levels in the evening from 7:00 p.m. to 10:00 p.m. This additional weighting of nighttime sound is intended to take into account the usual increased interfering effects of noise during the nighttime hours.

The EIR contained a fixed standard of 65 CNEL for measuring when aircraft noise was considered to create a significant environmental effect. This definition is critical, because once "significant effects" have been identified in the EIR, an agency must explore implementing feasible mitigation measures or alternatives to avoid or reduce the effect. (§§ 21081, 21002.1.) The EIR concluded that noise impacts would only be significant if, over a 24-hour period, the average noise levels either (1) increased by more than 1.5 CNEL in those areas already experiencing noise levels greater than 65 CNEL, or (2) caused the noise levels in an area to exceed 66.5 CNEL.[17] The EIR explained that the CNEL methodology for determining the significance of aircraft noise on residential areas is based on the research and recommendations of the Federal Interagency Committee on Noise, the FAA's standard residential noise compatibility criteria, and the State of California's airport noise standards for compatibility with residential land uses.[18]

Using the CNEL data, the EIR contained maps of land uses in the Airport vicinity, with noise contours superimposed on the maps that show exactly which areas will experience aircraft noise at 65, 70 and 75 CNEL in 2000

---

[17]The EIR also contained some "time above" (TA) figures in addition to the CNEL-based criteria. The TA descriptor addresses the issue of peak noise levels by providing an estimate of the cumulative amount of time over the course of a day when aircraft noise would exceed a given noise level. However the EIR made it clear that "TA values are also used to characterize noise impacts but are not used as an independent criterion for significance."

[18]California Code of Regulations, title 21, section 5012, setting California airport noise standards, states: "The standard for the acceptable level of aircraft noise for persons living in the vicinity of airports is hereby established to be a community noise equivalent of 65 decibels." (See *Bakman v. Department of Transportation* (1979) 99 Cal.App.3d 665, 681-684 [160 Cal.Rptr. 583] [in reviewing Department of Transportation's decision to issue an amended airport permit for the purpose of proposed airport expansion, there was no showing airport was violating airport noise standards].)

and 2010. The noise contour maps also compare future noise levels under the ADP both to existing conditions and to future conditions without the ADP. Using 65 CNEL as the threshold of measuring a significant noise impact, the EIR came to several conclusions:

—In 2000 (the EIR assumed the ADP would be constructed by 2000 [see fn. 2]) the number of residences experiencing aircraft noise at or above 65 CNEL, even with the greater number of flights forecast with the ADP, would actually *decrease* from over 1,000 in 1994 to only 12. Because the Port holds avigation easements[19] for all of these residences, no mitigation measures were proposed.

—The EIR concluded that the noise levels would decrease, despite the substantial increase in flights, because jet aircraft are becoming quieter, and federal law requires air carriers to convert their noisier "Stage 2" jet engines to quieter "Stage 3" engines by 2000.[20] As a result, in 2000 even with the ADP, there would be no aircraft noise impacts that qualified as significant.

—By 2010, even with implementation of the ADP and the maximum amount of passenger and air cargo activity that could occur, the total number of residences within the 65 CNEL boundary would still be fewer than the number of residences significantly impacted by noise in 1994. In 2010, there would be 288 residences significantly impacted by noise on Bay Farm Island (the area immediately adjacent to the Airport's northern boundary and the site closest to runway 11/29), 259 in San Leandro, and 10 in Alameda.

—Because the Port holds avigation easements for all 10 of the affected residences in Alameda, and 233 of the 288 residences on Bay Farm Island, no mitigation measures were offered to mitigate the project's noise impacts on these homes.

2. *Requests for Supplementary Noise Analysis*

■ "The purpose of requiring public review [of an EIR] is to ' " 'demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' " [Citation.]' . . ." (*Schoen v. Department of Forestry & Fire Protection* (1997) 58 Cal.App.4th

---

[19]Avigation easements are private agreements that subject property to conditions caused by aircraft noise.

[20]The EIR acknowledged that Stage 3 requirements do not apply to privately owned jets or other jets with a maximum takeoff weight of 75,000 pounds or less, and no reduction in noise from these types of jets was assumed in the EIR's analysis.

556, 573-574 [68 Cal.Rptr.2d 343].) ▮▮▮ It is fair to say that the disposition of the citizenry who attended public hearings, signed petitions, and wrote letters in response to the draft EIR's noise analysis went beyond "apprehensive" and could more aptly be described as "incredulous."

One commenter implored: "How can the document claim that only 10 homes [in Alameda] will be affected by noise in the year 2010 when currently there are hundreds of homes negatively affected by noise . . . ? Such a statement calls into question the truthfulness of the Draft EIS/EIR." Residents, whose homes fell well outside the 65 CNEL threshold limitation defined by the EIR, reported often being awakened in the middle of the night by aircraft noise, and being unable to talk on the telephone or carry on ordinary conversations when planes fly overhead.

Over 1,000 Berkeley residents registered their concern over the proposed ADP, declaring the significant increase in noise caused by jet overflights has "fundamentally transformed our quiet residential neighborhoods, disrupting sleep, study, work and our peaceful enjoyment of our homes, gardens, and parks." The Berkeley City Council and City Manager noted the "intolerable" existing noise issues arising from the Airport and urged the Port to implement specific mitigation measures before expanding the volume of air traffic. Despite this outcry, the Port, in its draft EIR, does not even mention, much less analyze, Berkeley noise impacts because that city falls significantly outside the 65 CNEL corridor.

Numerous citizens complained that the EIR failed as an information document because it bypassed any analysis of the ADP's impact on residents' sleep even though the project would substantially increase nighttime noise levels in noise-sensitive areas. The Port's response to these comments was steadfast and consistent: "The noise analysis is based on the CNEL descriptor which was developed to reflect the greater annoyance posed by noise events that occur during evening and nighttime periods relative to those that occur during the daytime. Also, since aircraft noise impacts are evaluated in the Draft EIS/EIR in terms of increases over 65 CNEL, and since 65 CNEL correlates with the maximum amount of aircraft noise exposure generally compatible with residential uses, the analysis implicitly takes into account the potential for such effects as speech and sleep interference."

In discussing the impacts of aircraft noise on their normally quiet neighborhoods, members of the public submitted more than their subjective, anecdotal accounts of how aircraft overflights had disrupted their normal

nocturnal lives. Their first party accounts were supported by the opinions from several experts who criticized the draft EIR for failing to discuss the impact of individual noise events, such as a single aircraft flyover, in addition to the ADP's effect on average noise levels. These experts urged the Port to conduct a meaningful analysis of the direct effects of single-event noise levels on speech communication and sleep disturbance in normally quiet residential neighborhoods areas that fell outside the 65 CNEL noise contour.

Acoustical engineer James Nelson, Ph.D., performed a detailed noise sampling and modeling in a Berkeley hills neighborhood. Dr. Nelson's data revealed that existing flights over Berkeley had already caused significant impacts to sleep disturbance. He opined: "A significant number of aircraft over-flights (20%) appear to produce maximum noise levels in excess of 65 dBA, roughly 20 dBA higher than the median sound level during the day, and 30 dBA higher than the median sound level occurring during the late-night and early morning hours. [¶] Twenty percent of existing aircraft over-flights may produce single event levels in excess of SEL 61 [Single Event Level] in bedrooms with open windows. . . . The Draft EIS/EIR for the Oakland Development Project indicates that a single noise event with SEL 61 or higher will disturb the sleep of about 30% or more of those people exposed to such noise. About 17% or more of those people so exposed may be awakened from sleep, if only briefly, and possibly without remembering." Based on this data, Dr. Nelson concludes that "a disproportionate increase in the number of late night over-flights over Berkeley resulting from the Oakland Airport Development Program could adversely affect the existing noise environment," and urged further analysis of single-event noise to fill the gaps in the EIR's noise analysis.

Acoustical consultant John Freytag, who was retained by petitioners, offered this opinion: "An analysis of sleep interference, speech interference and single event noise is required for the residential communities of Alameda which are and will continue to be impacted by the Airport. . . . The sleep interference assessment must consider the Single Event Levels (SEL values) of the individual flyovers occurring during the nighttime (sleeping period), and the frequency of occurrence of these events."

In considering the criticism that the draft EIR had unreasonably failed to quantify with any precision the effect of single noise events on area residents, the Port retreated to the CNEL methodology for measuring acceptable noise limits for the residential neighborhoods surrounding the Airport. The Port responded: "The CNEL is the FAA-endorsed descriptor for evaluating

airport noise impacts. Single-event descriptors, such as the SEL or TA values, are supplementary to the CNEL and help to characterized [*sic*] the noise environment, but are not an independent basis for determining significant effect. The fact that some residents would characterize a 3-CNEL change in the 60 to 65 range as a degradation of the noise environment does not mean that the change is 'significant' for the purposes of CEQA or NEPA [federal National Environmental Policy Act]."

The Port also clarified its position with regard to residential uses outside the 65 CNEL contour that would experience a change in noise due to the ADP: "The Draft EIS/EIR discloses the impact and the perception by some that a 3-CNEL change below 65 CNEL represents a degradation of their noise environment, but does not conclude that such impacts would be significant." On December 16, 1997, the Port Commissioners voted to certify the EIR without conducting any supplemental noise analysis.

### 3. Use of CNEL Methodology as Sole Indicator of Significant Effects from Noise

On appeal, petitioners revive the claim made below that the EIR's exclusive reliance on the cumulative CNEL metric does not provide a true or complete picture of the noise environment resulting from the increase in nighttime flights that would result if the ADP were adopted. At the outset, it is important to clarify petitioners' position in this appeal. The Port characterizes petitioners' position as advocating that "the EIR should have based its noise significance criteria, and therefore its noise analysis, on individual noise events rather than on the cumulative noise measure provided by CNEL." Petitioner CLASS explains its position: "[T]he flaw in the EIR's noise analysis is its failure to provide, *in addition to the CNEL analysis*, the most fundamental information about the project's noise impacts, specifically the number of additional nighttime flights that will occur under the ADP, the frequency of those flights, and their effect on sleep. In view of the huge increase in nighttime cargo flights that will occur under the ADP, an analysis of the project's impact on sleep is critical to enable nearby residents to understand how the ADP will affect their lives." (Italics added.)

Petitioners' argument derives substantial support from the case of *Davison v. Department of Defense* (S.D. Ohio 1982) 560 F.Supp. 1019, a case which parallels this one in numerous respects. In *Davison*, the plaintiffs challenged the sufficiency of an EIS prepared in connection with the addition of civilian air cargo operations at Rickenbacker Air National Guard Base. The "greatest single environmental impact" occasioned by the proposed nighttime air

cargo flights was on the sleep of the people who lived near the airfield. (*Id.* at p. 1033.) Like the EIR here, the EIS prepared for the project set 65 Day-Night Average Sound Level (DNL)[21] as the threshold for significant noise exposure and identified which houses would be significantly affected. The court held that DNL, even when coupled with a time-above analysis, did not adequately inform the public about how an increase in nighttime flights would affect sleep in a nearby residential area. The court concluded that while the nighttime "penalty" in cumulative noise calculations gave some indication of the increase in nighttime flights, "the great magnitude of this difference should have been made plain in the EIS." (*Id.* at p. 1036.) The court stated, "The reader . . . cannot gain any real appreciation of the potential disruption simply by being told the number of minutes that aircraft noise will occur when all of the overflight peak level events are strung together." (*Id.* at p. 1037.)

The *Davison* court cited several technical deficiencies in the EIS. First, the study did not state the number of night flights that traditionally had taken off or landed at Rickenbacker. (*Davison v. Department of Defense, supra,* 560 F.Supp. at p. 1037.) Second, it did not estimate the number of times a nearby resident could be awakened by overflights during "normal" or "worst case" nights. Third, the study did not discuss whether residents' sleep disturbance would diminish over time. Finally, the EIS did not address the issue of whether long-term exposure to noise-induced sleep disturbance would result in any important physiological effects. The court pointed out that because these issues would be vital considerations to a decision maker analyzing the proposal, the EIS did not meet NEPA's mandate to explore unavoidable environmental consequences " 'to the fullest extent possible.' " (*Ibid.*) The EIR under review in this case suffers from the identical deficiencies as the document reviewed in *Davison.*

We need not discuss in depth the numerous federal decisions analyzing federal requirements under NEPA that have approved the use of the sound methodology used in this case for assessing aircraft noise. Those decisions were guided by factors not present here. (See, e.g., *Morongo Band of Mission Indians v. Federal Aviation* (9th Cir. 1998) 161 F.3d 569, 578-579 [upholding use of CNEL in evaluating noise impacts on undeveloped rural areas]; *Seattle Community Council Federation v. F.A.A.* (9th Cir. 1992) 961 F.2d 829, 833-834 [upholding use of CNEL for project involving changes in flight paths]; *Communities, Inc. v. Busey* (6th Cir. 1992) 956 F.2d 619,

---

[21]The DNL indicator, which has been adopted by the EPA and the FAA, is a time-weighted cumulative noise metric which averages noise levels over a 24-hour period. It is substantially similar to the CNEL, which is used in California.

624-625 [EIS did in fact analyze the impact of increased single-event noise]; *Valley Citizens for a Safe Environment v. Aldridge* (1st Cir. 1989) 886 F.2d 458, 469 [failure to challenge CNEL methodology for measuring noise impacts during comment period barred attacking it after EIS was complete]; *Sierra Club v. United States Dept. of Transp.* (D.C. Cir. 1985) 753 F.2d 120, 128-129 [upheld noise analysis which included information about individual noise events and imposed noise abatement conditions on airport to alleviate noise problem].)

Nor is the case of *Bakman v. Department of Transportation, supra,* 99 Cal.App.3d 665, instructive. The issue in *Bakman* concerned homeowners' challenges to a Department of Transportation (DOT) approval of an amended airport permit for the Fresno Air Terminal. The amended permit was necessitated by the acquisition of properties by the Fresno terminal for airport expansion outside the Fresno city limits. (*Id.* at pp. 674-675.) One of the challenges alleged DOT failed to consider the impact of Fresno Terminal's noise on nearby residents. (*Id.* at p. 675.) The court concluded that DOT did not violate either state law or regulations in accepting the adequacy of the CNEL analysis used by DOT to evaluate airport noise for permitting purposes. (*Id.* at p. 684.) However, like the federal cases relied on by the Port, *Bakman* did not involve a challenge relating to noise impacts under CEQA.

In addition, unlike here and in *Davison,* the effect on sleep patterns from a proposed increase in overnight flights over noise-sensitive residential areas was not in issue in these cases. Moreover, while federal authority interpreting environmental requirements under NEPA and residential land use planning standards may be helpful to the issue before us, it is important to stress that this is a case brought under CEQA, which imposes its own requirements for assessing environmental impacts from noise. Our Supreme Court has counseled that we "need not follow federal precedent [under NEPA] . . . when the federal provisions cannot fairly be said to parallel ours. [Citations.]" (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 121 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) We find there are important distinctions between the requirements imposed by CEQA and by NEPA in assessing noise impacts that allow us to depart from the federal cases on this subject.

The Legislature has declared in CEQA that "it is the policy of the state" to "[t]ake all action necessary to provide the people of this state with . . . freedom from excessive noise." (§ 21001, subd. (b).) The Legislature has further declared that it is the state's policy to "[r]equire governmental agencies at all levels to consider *qualitative* factors as well as economic and

technical factors . . . ." (§ 21001, subd. (g), italics added.) Thus, through CEQA, the public has a statutorily protected interest in quieter noise environments.

CEQA analysis is directed toward identifying any substantial adverse changes in physical conditions (§§ 21060.5, 21100, subd. (d)). An impact is considered "significant" for purposes of CEQA if it will effect a "substantial, or potentially substantial, adverse change in the environment." (§ 21068; Guidelines, § 15002.) At the time the EIR was certified, CEQA's significance criteria for evaluating noise were primarily derived from appendices G and I of the CEQA Guidelines. Appendix G presented different scenarios where a " 'project will normally have a significant effect on the environment . . . .' " It defined a significant noise effect as an action with the potential to " 'increase substantially the ambient noise levels for adjoining areas; . . .' " (*Lewis v. Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823, 829, fn. 7 [211 Cal.Rptr. 884].) Appendix I, the initial study checklist, stated that any proposal which results in increases in existing noise levels or exposure of people to severe noise levels may require mitigation measures.

By contrast, in implementing NEPA, the FAA has developed specific quantitative significance criteria for measuring aviation noise. (See generally 40 C.F.R. § 1501.3(a) (2001).) The FAA has determined that a significant noise impact would occur if a noise analysis indicates "the proposed action results in an increase within the DNL 65 db contour of DNL 1.5 dB or greater on any noise sensitive area." (U.S. Dept. of Transportation Federal Aviation Admin., Policies and Procedures for Considering Environmental Impacts (June 14, 1999), p. 45.)[22]

We find it noteworthy that CEQA appendices G and I could have defined significant noise impacts simply in terms of whether a project would violate applicable local, state, or federal noise standards. Instead, by adopting a site-sensitive threshold of significance for noise, the Guidelines mirror the proposition that "[a]n ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may

---

[22]However, the FAA's directions for preparing environmental documents also recognizes that "If conditions warrant, additional analysis to supplement DNL may be necessary and will be considered on a case-by-case basis. *Supplemental noise analyses are most often used to determine aircraft noise impacts at specific noise-sensitive locations or for noise-sensitive situations.*" (U.S. Dept. of Transportation Federal Aviation Admin., Policies and Procedures for Considering Environmental Impacts, *supra*, p. 47, italics added.)

be significant in a rural area." (Guidelines, § 15064, subd. (b); see Comment, *Reconciling Environmental Protection with the Need for Certainty: Significance Thresholds for CEQA* (1995) 22 Ecology L.Q. 213, 234-236, 273.)

Given the uniqueness of the CEQA standard, the fact that residential uses are considered compatible with a noise level of 65 decibels for purposes of land use planning is not determinative in setting a threshold of significance under CEQA. For example, in *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872 [274 Cal.Rptr. 720], the court ruled that citizens' personal observations about the significance of noise impacts on their community constituted substantial evidence that the impact may be significant and should be assessed in an EIR, even though the noise levels did not exceed general planning standards. (*Id.* at pp. 881-882.)

As a further example, the State Airport Land Use Planning Handbook, which the Port is required to use "as a technical resource" in assessing "noise problems" for purposes of EIR preparation (§ 21096), specifically addresses the shortcoming of exclusive reliance on the CNEL metric for assessing changes in aircraft-related noise levels in quieter environments. The pertinent section of the handbook states: "[A] standard application of cumulative noise exposure metrics is to predict the effects of increased noise resulting from proposed or projected physical or operational changes at an airport. Addressing these anticipated effects is one of the functions of environmental impact documents prepared for airport-related projects." After discussing the standards of significance established for cumulative noise metrics, the handbook states: "Not reflected in these screening criteria is that noise increases of several decibels may also be significant in quieter environments (ones below DNL 60)."

In summarizing the EIR's analysis with regard to nighttime flights, the Port concedes that implementation of the ADP will increase the existing noise levels for quiet East Bay neighborhoods. Despite this acknowledgement, the EIR contained no quantitative discussion of ambient noise levels in any nearby community. Instead, as explained in a written response to public comment on the draft EIR's noise analysis, the significance criteria used in the EIR automatically excluded "all residential uses within the 65 CNEL contour *regardless of the change in noise*" due to the ADP. (Italics added.) Consequently, implementation of the ADP could increase a community's nighttime noise level to 64.9 CNEL, and under the sole criterion of the CNEL metric, this increase would not create a significant impact for purposes of CEQA. This conclusion is derived without any meaningful analysis

of existing ambient noise levels, the number of additional nighttime flights that will occur under the ADP, the frequency of those flights, to what degree single overflights will create noise levels over and above the existing ambient noise level at a given location, and the community reaction to aircraft noise, including sleep disturbance.

The probability of being repeatedly awakened by multiple single-event sounds can be calculated, given sufficient data. The appendix to the EIR included a technical treatise entitled "Description of Noise and its Effects on People." This document describes a supplementary single-event noise analysis used for predicting what percentage of the population is expected to be awakened by an aircraft overflight. The treatise explains, "[T]he sound exposure level [SEL] has been found to be *the most appropriate and useful* descriptor for most types of single event sounds including aircraft fly-bys." (Italics added.) Included is a table in which "the frequency of sleep disruption (as measured by changes in sleep stage, including behavioral awakening) is plotted as a function of the Sound Exposure Level." Unfortunately, the Port's expertise was never utilized to conduct such an analysis.[23]

We believe the potential noise impact of increased nighttime flights mandates further study. The Guidelines provide that the level of detail required in addressing particular impacts should be "in proportion to their severity and probability of occurrence." (Guidelines, § 15143.) Using this standard, the Port cannot simply ignore the CEQA standard of significance for assessing noise, the credible expert opinion calling for further evaluation of the impact of single-event noise, and public concern over the noise created by increased nighttime flights. CEQA requires that the Port and the inquiring public obtain the technical information needed to assess whether the ADP will merely inconvenience the Airport's nearby residents or damn them to a somnambulate-like existence.

Furthermore, a supplementary analysis will provide more accurate information than was given the public in late 1996, when the EIR was made

---

[23]At oral argument on this matter, the Port directed this court's attention to the noise appendix in the EIR which contained a table of single-event noise levels generated from the takeoff of four different aircraft types (two Stage 2 aircraft and two Stage 3 aircraft) measured at four different locations near the airport. While the Port claims this data fulfills any duty it might have under CEQA to conduct a supplementary single-event noise analysis, it is obvious this table was *not* compiled in an attempt to measure how many high-noise events will take place during the noise-sensitive nighttime hours or to describe the effects of noise on normal nighttime activities, such as sleep. Instead, the table was compiled to substantiate the EIR's conclusion that a phaseout of noisy Stage 2 aircraft could reasonably be expected to offset a doubling of overall aircraft operations. Significantly, none of the information from this table is analyzed or even reflected in the text of the EIR's noise section.

available for public review. On this point, the record reveals that the EIR assumed 100 percent compliance with the phaseout of noisy Stage 2 aircraft for both analysis years (2000 and 2010). The EIR went on to hypothesize, "The continued phase-out of Stage 2 aircraft would be expected to more than offset the increase in late night departures through 2000. With the elimination of Stage 2 aircraft, the noisiest existing late-night aircraft events at [the Airport] would be eliminated." Given that we are past the 2000 deadline for the phasing out of Stage 2 aircraft, we believe that this hypothesis can be tested and a more accurate assessment of the existing noise levels around the airport can be made. "In some cases, conditions closer to the date the project is approved are more relevant to a determination whether the project's impacts will be significant. [Citation.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 125 [104 Cal.Rptr.2d 326].) This is such a case.[24]

E.-H.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI.

### DISPOSITION

In appeal No. A086708, the judgment granting a peremptory writ of mandate is reversed in part and affirmed in part. The matter is remanded to the superior court with directions that the court issue a new writ of mandate consistent with this opinion. Such order shall include only those mandates necessary to achieve compliance with CEQA in accordance with this opinion. Pursuant to section 21168.9, subdivision (b), the court shall determine whether portions of the ADP are severable and may proceed pending the additional environmental review required pursuant to the court's mandate.

Appeal No. A089660 has been rendered moot by the court's lack of jurisdiction to enter an order discharging the writ. The matter is remanded to

[24]Petitioners have raised several other arguments challenging other aspects of the EIR's treatment of the noise-related impacts from the project and the proposed mitigation. Our determination that the noise analysis contained in the EIR was inadequate has rendered these issues moot. However, petitioners' additional challenges can be raised again depending on the Port's action on remand.

*See footnote, *ante*, page 1344.

the superior court with directions that the court order the Port Commissioners to vacate the certification of the supplement to the EIR entered on June 29, 1999. The Port Commissioners shall be ordered not to take any further action to approve the project without the preparation, circulation and consideration under CEQA of a legally adequate EIR with regard to the issues discussed in this opinion.

In appeal No. A087959, the superior court's order awarding $180,000 attorney fees is hereby reversed. On remand, the court is to issue a new order awarding petitioners legal fees under Code of Civil Procedure section 1021.5 in accordance with the views expressed in this opinion.

Petitioners are awarded their costs on appeal.

Kline, P. J., and Haerle, J., concurred.

A petition for a rehearing was denied September 26, 2001, and the opinion was modified to read as printed above. The petition of appellant Board of Port Commissioners of the City of Oakland for review by the Supreme Court was denied November 20, 2001.