Filed 6/21/16

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| UKIAH CITIZENS FOR SAFETY FIRST,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF UKIAH et al.,<br><br>    Defendants and Respondents. | A145581<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVPT1463579) |

Plaintiff Ukiah Citizens for Safety First (Citizens) appeals from the denial of its petition for writ of mandate under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21050 et seq.),[1] challenging the certification of an environmental impact report (EIR) by the City of Ukiah and its city council (the city) for the construction of a Costco Wholesale Corporation (Costco) retail store and gas station. Citizens contends: (1) the EIR did not properly identify and analyze potentially significant energy impacts generated by the project; (2) the EIR's analysis of transportation and traffic impacts is inadequate; (3) the EIR's analysis of noise impacts is inadequate; and (4) the project is inconsistent with applicable zoning requirements.

We agree with Citizens that the EIR fails to sufficiently analyze potential energy impacts and that the adoption of an addendum to the EIR subsequent to approval of the EIR and of the project failed to comply with CEQA requirements. In the unpublished portion of this opinion, we reject the remainder of Citizens' contentions. Accordingly, we

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 3, 4, and 5 of the Discussion.

[1] All further statutory references are to the Public Resources Code unless otherwise noted.

1

shall reverse the judgment and instruct that the petition for writ of mandate be granted with respect to the analysis of energy impacts of the project and affirm the trial court's decision in all other respects.

## Factual and Procedural Background

On February 1, 2011, Costco applied for a use permit to construct a warehouse store and gas station (the project) on a 15.33-acre site located in the southeast section of the city. Because the project did not comport with current zoning, Costco also sought to have the site rezoned.

On January 30, 2013, the city released a draft EIR for the project. In November 2013, following the period for public comment, the city released the final EIR. The EIR describes the project as a 148,000-square-foot retail facility with a bakery, pharmacy, optical center, hearing aid testing center, food court, photo center, tire center, and a gas station with 16 pumps. The store would provide 608 parking stalls for customer vehicles.

Among other things, the EIR reports the project would increase traffic volumes on area roadways resulting in significant traffic impacts at identified intersections. The EIR includes mitigation measures to reduce the impact, including modifications to the impacted intersections, that will result in acceptable conditions at the impacted intersections. However, due to uncertainty of timing and funding of the mitigation measures, the EIR concludes that the traffic impacts of the project cannot be mitigated to a level that is less than significant. The EIR also concludes that the increase in local traffic volumes would result in higher noise levels along local roadways but that traffic noise associated with the project would be less than significant.

On December 18, 2013, the city certified the EIR and adopted a statement of overriding considerations. On January 15, 2014, the city adopted the necessary rezoning legislation. The CEQA notice of determination was filed on January 16, 2014.

On February 11, 2014, Citizens filed a petition for a writ of mandate challenging the sufficiency of the EIR and the related rezoning legislation. On May 1, 2015, the court issued a decision denying the petition in its entirety. Citizens filed a timely notice of appeal.

**Discussion**

1.    *Standard of Review*

The city's compliance with CEQA is reviewed for an abuse of discretion. (§ 21168.5.) An "[a]buse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid*.) " 'An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [public agency] and whether it contains substantial evidence to support the [public agency's] factual determinations.' [Citation.] . . . When a public agency does not comply with procedures required by law, its decision must be set aside as presumptively prejudicial. [Citation.] [¶] Noncompliance by a public agency with CEQA's substantive requirements or noncompliance with its information disclosure provisions that preclude relevant information from being presented to the public agency 'constitute[s] a prejudicial abuse of discretion within the meaning of sections 21168 and 21168.5 . . . , regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' [Citations.] 'In other words, when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation.' [Citation.] We apply the substantial evidence standard of review to a public agency's 'conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions.' [Citation.] 'Substantial evidence' is defined as 'enough relevant information and reasonable inferences from this information that a fair

3

argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.] 'The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision.' [Citation.] However, '[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous . . . is not substantial evidence. Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' " (*City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 839-840.)

2.      *Energy Impacts*

"An EIR must include a statement concerning '[m]itigation measures proposed to minimize significant effects on the environment, including, but not limited to, measures to reduce the wasteful, inefficient, and unnecessary consumption of energy.' (. . . § 21100, subd. (b)(3).) The CEQA Guidelines[2] provide that: 'Energy conservation measures, as well as other appropriate mitigation measures, shall be discussed when relevant. Examples of energy conservation measures are provided in [a]ppendix F.' (CEQA Guidelines, § 15126.4, subd. (a)(1)(C).) Appendix F of the CEQA [G]uidelines . . . states: 'Potentially significant energy implications of a project should be considered in an EIR [to the extent relevant and applicable to the project]. The following list of energy impact possibilities and potential conservation measures is designed to assist in the preparation of an EIR. In many instances, specific items may not apply or additional items may be needed.' In list form, [a]ppendix F discusses how energy consumption and conservation may be analyzed in the EIR." (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 930.)[3]

_____

[2] As in the opinion which is here quoted, we shall refer in this opinion to the regulations appearing at California Code of Regulations, title 14, section 15000 et seq., as the CEQA Guidelines.

[3] Appendix F lists the environmental impacts that may be included in the EIR: "1. The project's energy requirements and its energy use efficiencies by amount and fuel type for

4

The EIR, as certified on December 18, 2013, does not contain a separate section for the analysis of energy impacts. Rather, energy impacts are mentioned throughout the EIR. The city points out that the potential increase in electrical and natural gas usage and whether the project would result in wasteful, inefficient, or unnecessary energy consumption are discussed in conjunction with the analysis of impacts to public utilities in section 3.9 of the EIR. The city also cites to the discussion of the effects of energy usage on air quality and greenhouse gas emissions found in the discussion of global climate change in section 3.11 of the EIR.

In section 3.9.8, the EIR concludes that the project "would not exceed existing gas and electric supply or result in wasteful, inefficient, or unnecessary consumption of energy." The EIR explains, "The proposed project would intensify development on the project site, thereby increasing demand for gas and electric service. On-site employment and uses, such as the warehouse store and tire center, would use gas and electricity. These uses would generate demand for 2.44 million kilowatt hours of electricity per year . . . . The project area has existing distribution facilities and capacity to serve the project. [¶] The energy consumption demands of the proposed project would conform to the

---

each stage of the project including construction, operation, maintenance and/or removal. If appropriate, the energy intensiveness of materials maybe discussed. [¶] 2. The effects of the project on local and regional energy supplies and on requirements for additional capacity. [¶] 3. The effects of the project on peak and base period demands for electricity and other forms of energy. [¶] 4. The degree to which the project complies with existing energy standards. [¶] 5. The effects of the project on energy resources. [¶] 6. The project's projected transportation energy use requirements and its overall use of efficient transportation alternatives." (CEQA Guidelines, appendix F.) Appendix F also lists mitigation measures that may be included in the EIR: "1. Potential measures to reduce wasteful, inefficient and unnecessary consumption of energy during construction, operation, maintenance and/or removal. The discussion should explain why certain measures were incorporated in the project and why other measures were dismissed. [¶] 2. The potential of siting, orientation, and design to minimize energy consumption, including transportation energy, increase water conservation and reduce solid-waste. [¶] 3. The potential for reducing peak energy demand. 4. Alternate fuels (particularly renewable ones) or energy systems. [¶] 5. Energy conservation which could result from recycling efforts." (*Ibid.*)

[California Code of Regulations'] Title 24 energy conservation standards such that the development would not be expected to wastefully use gas and electricity. The proposed project would also be designed to include several sustainable features. Among these features are regional sourcing of building materials, higher solar reflectivity metal wall panels, reflective roof materials, and tripled-glazed skylights . . . .[4] Since the proposed project would comply with title 24 conservation standards, implement additional sustainable features, and be served by the City of Ukiah, the proposed project would not directly require the construction of new energy generation or supply facilities, or result in wasteful, inefficient, or unnecessary consumption of energy. Consequently, the impact would be less than significant."

In section 3.11.1, relating to "Global Climate Change," the EIR acknowledges that the project "could generate [greenhouse gas] emissions that may have a significant impact on the environment" but explains that implementation of mitigation measures that "include incorporation of sustainability features in the building and site design in order to reduce energy consumption and exceed the Title 24 building efficiency ratings, (Measure 3.2.2a), implementation of a carpool/vanpool program (Measure 3.2.2b), increase transit accessibility (Measure 3.2.2c), and improve the pedestrian network (Measure 3.2.2d) [¶] . . . would reduce [the] emissions . . . . However, the majority of the [greenhouse gas] emissions are mobile-source, and feasible reduction measures beyond vehicle fuel efficiency (state and federal requirements), and encouraging alternative transportation, are not available."

Citizens' petition asserts that the EIR "fails to include adequate information regarding the project's energy use and does not comply with appendix F of the CEQA Guidelines." Specifically, Citizens argues that the EIR failed to calculate the energy use attributable to vehicle trips generated by the project and failed to calculate the operational and construction energy use of the project. After the EIR was certified and Citizens filed

---

[4] The EIR lists on pages 2.8 and 2.9 the typical sustainable building features incorporated into new Costco warehouses to conserve energy and natural resources.

6

its writ petition, on February 28, 2014, the Court of Appeal for the Third District issued its opinion in *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173 (*CCEC*).

In *CCEC*, the court held that the analysis of energy impacts in an EIR, which was in all material respects the same as that undertaken by the city in this case, was not adequate. (*CCEC*, *supra*, 225 Cal.App.4th at pp. 206-207.) With respect to the EIR's analysis of transportation energy impacts, the *CCEC* court noted that the EIR concluded the project would result in 40,051 new vehicle trips each day but failed to assess any transportation energy impacts of these vehicle trips. (*Id*. at p. 210.) The court rejected the City of Woodland's argument that the EIR's mitigation measures designed to reduce vehicle trips would also reduce energy impacts, explaining the City of Woodland "cannot say how much less transportation energy is needed for the project as approved because the issue has never been assessed in an EIR. CEQA EIR requirements are not satisfied by saying an environmental impact is something less than some previously unknown amount." (*Ibid*.) With respect to the analysis of operational and construction energy use of the project, the court found that the City of Woodland's reliance on mitigation measures that required compliance with title 24 and other California green building codes did not meet the requirements of appendix F. (*CCEC*, at p. 210.) The court explained, "Although the [California Building Standards Code (Cal. Code Regs., tit. 24, pt. 6) (Building Code)] addresses energy savings for components of new commercial construction, it does not address many of the considerations required under appendix F of the CEQA Guidelines. These considerations include whether a building should be constructed at all, how large it should be, where it should be located, whether it should incorporate renewable energy resources, or anything else external to the building's envelope. Here, a requirement that [the project] comply with the Building Code does not, by itself, constitute an adequate assessment of mitigation measures that can be taken to address the energy impacts during construction and operation of the project." (*Id*. at p. 211.) Finally, the court rejected reliance on mitigation measures adopted under the rubric of reducing greenhouse gas emissions that "would likely have the collateral effect

7

of substantial energy-saving effects." (*Id.* at p. 208, fn. 6.) The court explained, "Although there is likely to be a high correlation between reducing greenhouse emissions and energy savings, this court cannot assume the overlap is sufficient under CEQA's study and mitigation requirements. . . . 'Air quality mitigation is not a substitute for an energy analysis.' Thus, we will not consider [the] mitigation measure[] in our discussion of mitigation measures addressing energy impacts." (*Ibid.*)

The EIR certified by the city in this case in December 2013 clearly fails to meet the standards set forth in *CCEC, supra,* 225 Cal.App.4th 173. As in that case, the Costco EIR concludes that the project will generate 11,204 new vehicle trips per weekday and 8,708 new trips per weekend day, but fails to calculate the resulting energy impacts of those trips. The EIR also improperly relies on compliance with the building code to mitigate operational and construction energy impacts, without further discussion of the appendix F criteria. Finally, as in *CCEC*, the city's reliance on mitigation measures designed to reduce greenhouse gas emissions is misplaced.

Recognizing the deficiencies in its EIR as made clear by the *CCEC* opinion, on December 3, 2014, the city adopted an addendum to the EIR. The addendum "clarifies and provides additional discussion of project energy consumption and electrical utilities." The summary to the addendum explains, "The city is clarifying its determination that 'the project would not exceed existing gas and electric supply or result in the wasteful, inefficient, or unnecessary consumption of energy' in part based on the recent court decision, *CCEC*[*, supra,*] 225 Cal.App.4th 173, which was published after the city certified the EIR. That decision held that CEQA requires a more detailed discussion of energy use than was previously understood at the time the EIR was certified. This discussion augments, but does not alter, the conclusions of the EIR regarding the effects of project-related energy usage." The statements regarding energy impacts in the final EIR, set forth above, are incorporated with "additional clarification and technical information regarding project-related energy usage and conservation features" into a single 10-page analysis of the potential energy impacts. The addendum addresses construction energy usage and concludes that project "construction would not consume a

8

greater amount of energy in its construction phase than similar projects." The addendum also addresses operational energy usage, including energy usage associated with transportation fuel consumption, and concludes that with implementation of the mitigation measures identified in the EIR, the project "would not consume a greater amount of energy in its operational phase than similar projects."

Over Citizens' objection, the trial court considered this addendum in concluding that the EIR's analysis of potential energy impacts was sufficient. However, "under Code of Civil Procedure section 1094.5, courts can only review evidence that was actually before the administrative decision makers prior to or at the time of their decision." (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1032, fn. 13.) Accordingly, the addendum is not a part of the administrative record and cannot be considered in deciding whether the city abused its discretion in certifying the EIR.

Moreover, the city's subsequent approval of the addendum does not cure the prior approval of an inadequate EIR. The CEQA Guidelines authorize the preparation of an addendum to a previously certified EIR "if some changes or additions are necessary but none of the conditions described in section 15162 calling for preparation of a subsequent EIR have occurred." (CEQA Guidelines, § 15164, subd. (a).) While none of the conditions requiring a subsequent EIR apply here,[5] section 15164 nonetheless assumes that the EIR previously certified was properly certified. The section does not authorize the retroactive correction of an inadequate EIR based upon the consideration of which the project was approved, by providing the additional necessary information about the environmental effects of the project after the project has been approved. Section 15164, subdivision (d) provides explicitly, "The decision-making body shall consider the addendum with the final EIR . . . prior to making a decision on the project." The fact that

_____

[5]CEQA Guidelines section 15162 requires the preparation of a subsequent EIR if substantial changes are proposed in the project requiring major revisions of the previous EIR, if substantial changes occur with respect to the circumstances under which the project is undertaken requiring major revisions in the previous EIR, or if new information of substantial importance with respect to environmental effects, not known or which reasonably should have been known, becomes known.

the city considered the addendum when later approving certain replacement agreements and minor project changes does not, as the city contends, excuse the failure to consider the information contained in the addendum when approving the project itself.

Because the EIR, as certified, inadequately describes and discusses the energy impacts of the project, we must reverse the denial of the petition for a writ of mandate and remand the case for issuance of a writ, directing the city to set aside its certification of the final EIR, and approval of the project and to bring the energy section of the EIR into compliance with CEQA before redetermining whether to approve the project. (See CEQA Guidelines, § 21168.9.) We offer no opinion on whether the addendum adopted by the city complies with the requirements of CEQA for the analysis of energy impacts. As Citizens notes, the clarification and additional discussion of project energy consumption and electrical utilities included in the addendum have not been subjected to public comment. Although the city is correct that recirculation is not required when an addendum "merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an *adequate* EIR" (*Laurel Heights Improvement Assn. v. Regents of Univ. of California* (1994) 6 Cal.4th 1112, 1128), "recirculation is required, for example, when . . . the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless" (*id.* at p. 1130). Because the EIR certified in this case was inadequate in its analysis of energy impacts of the project, recirculation and consideration of public comments concerning the energy analysis will be necessary before the EIR may be certified and the project approved.

3.      *Transportation and Traffic Impacts*[*]

Under CEQA Guidelines appendix G, an environmental checklist, a project may have a potential significant impact on transportation and traffic if the project "[c]onflict[s] with an applicable plan, ordinance or policy establishing measures of effectiveness for the performance of the circulation system, taking into account all modes of transportation including mass transit and non-motorized travel and relevant

---

[*] Part 3 is not certified for publication.  (See fn., *ante*, p. 1.)

10

components of the circulation system, including but not limited to intersections, streets, highways and freeways, pedestrian and bicycle paths, and mass transit" or if it "[c]onflict[s] with an applicable congestion management program, including, but not limited to level of service standards and travel demand measures, or other standards established by the county congestion management agency for designated roads or highways." (CEQA Guidelines, appendix G.)

Consistent with appendix G, the EIR's transportation and traffic section "discusses existing transportation and traffic conditions in the project area, as well as potential impacts of the project to those conditions." The proposed project is located on the west side of U.S. Highway 101 on Airport Park Boulevard south of Talmage Road and Commerce Drive. Highway 101 is a primary route connecting the City of Ukiah to the City of Santa Rosa and the San Francisco Bay Area to the south, and Willits and other Mendocino County communities to the north. Talmage Road is a major arterial that provides a direct connection between South State Street and U.S. 101. Airport Park Boulevard extends from just north of Talmage Road along the project frontage to its terminus approximately three-quarters of a mile south of Talmage Road. Airport Park Boulevard has two travel lanes in each direction separated by planted medians and/or intermittent left turn lanes and provides primary access to the project site. The EIR notes that there are "future transportation improvements" proposed within the general vicinity of the project, including a proposal to reconfigure the southbound off-ramps from U.S. 101 on to Talmage Road and to construct two new left-turn lanes on the westbound Talmage Road approach to Airport Park Boulevard (the Talmage Road interchange improvements).

The traffic study contained in the EIR estimates that the project can be expected to generate 11,204 new trips per weekday and 8,708 new trips per weekend day, based in part, on traffic surveys conducted at three Costco stores in similar market areas. "The distribution of the project traffic was determined based on the population densities in the primary and secondary markets areas identified in 'Costco Wholesale Warehouse Urban Decay Analysis' prepared in April 2012 . . . . The potential route to and from each market

11

area was determined based on current travel patterns to and from the project area, and a percentage of assigned project-generated vehicle trips were derived from the share of each market area. These distribution percentages were then applied to the trip generation estimates to determine the number of vehicle trips on each route to and from the market destinations. Project trips were then added to all travel routes throughout the surrounding circulation system . . . ."

Based on the traffic study, the EIR finds that implementation of the project will result in potentially significant traffic impacts at and around the US 101/Talmage Road interchange and the Talmage Road/Airport Boulevard intersection. To mitigate the potentially significant traffic impacts, the EIR specifies as a mitigation measure that the city construct the Talmage Road interchange improvements. The mitigation measure provides: "The city shall coordinate with the California Department of Transportation regarding improvements to state facilities. The traffic mitigations shall be completed before Costco is issued a certificate of occupancy. The city shall establish a funding mechanism to pay for the cost of the improvements." The EIR finds that implementation of the Talmage Road Interchange Improvements "would result in acceptable operating conditions during both the a.m. and p.m. peak hours, and would result in acceptable queuing conditions in both the a.m. and p.m. peak hours."

In certifying the EIR, the city council issued findings that state: "The City of Ukiah is pursuing the Talmage Road interchange improvements as a separate city-sponsored project, because those improvements are required for the build-out of the Redwood Business Park, with or without the project. Costco is subject to an off-site traffic mitigation fee imposed on parcels in the Airport Industrial Park pursuant to Government Code section 66000 et seq. These fees were imposed to help fund a portion of the Talmage Road interchange improvements and will be used for this purpose. As of the preparation of the EIR, funding sources for the full cost of the Talmage Road interchange improvements have been identified, but full funding has not yet been secured. However, transportation and traffic mitigation measure 3.10.1 requires that the project funding must be obligated prior to the issuance of a building permit for the project

12

and the interchange improvements substantially completed prior to issuance of the certificate of occupancy for the project . . . ; thus assuring that no project-related traffic will be allowed to occur before these city-sponsored traffic mitigations are funded and substantially completed. [¶] A portion of the Talmage Road interchange improvements (Southbound Hwy 101 off-ramp and Talmage intersection reconstruction, 'Caltrans Improvements') is within the California Department of Transportation ('Caltrans') right of way and subject to its jurisdiction. The remaining improvements at Airport Park Boulevard and Talmage Road ('city improvements') are within the city's rights of way and subject to its jurisdiction. The city can design and construct the city improvements but the design and construction of the Caltrans improvements are within Caltrans' jurisdiction and are its responsibility. If funding were not secured for the Caltrans improvements or Caltrans does not approve the timely construction of those improvements, the city council finds that the above-described traffic impacts would be significant and unavoidable because specific economic, legal, social, technological, or other considerations (lack of funding or timely approval by Caltrans), make infeasible any further mitigation of them."

Citizens first contends that that the EIR engages in an improper "piecemeal" review of the significant environmental impacts of the project by failing to include analysis of the environmental impacts of the Talmage Road interchange improvements in the project EIR. "There is no dispute that CEQA forbids 'piecemeal' review of the significant environmental impacts of a project. This rule derives, in part, from section 21002.1, subdivision (d), which requires the lead agency . . . to 'consider[] the effects, both individual and collective, of all activities involved in [the] project.' It has been recognized that ' "[a] curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance. An accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR." ' "

13

(*Berkeley Keep Jets Over the Bay Com. v. Board of Port Comrs.* (2001) 91 Cal.App.4th 1344, 1358 (*Keep Jets Over the Bay*); *Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1222 (*Banning Ranch*) ["Agencies cannot allow 'environmental considerations [to] become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' "].)

In *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396, the court held that "an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." In *Banning Ranch, supra*, 211 Cal.App.4th at page 1223, the court attempted to define a "reasonably foreseeable consequence" as used in the *Laurel Heights* test. Observing that the "piecemealing case law defies easy harmonization," the court attempted nonetheless to sort the leading cases into "some potentially useful categories. [¶] First, there may be improper piecemealing when the purpose of the reviewed project is to be the first step toward future development. [Citations.] [¶] And there may be improper piecemealing when the reviewed project legally compels or practically presumes completion of another action. [Citations.] [¶] On the other hand, two projects may properly undergo separate environmental review (i.e., no piecemealing) when the projects have different proponents, serve different purposes, or can be implemented independently." (*Banning Ranch,* p. 1223.) The analysis of whether an additional action or project is the reasonable foreseeable consequence of the initial project "tends to be fact driven." (*Id*. at p. 1222.)

In this case, approval of the project is not "the first step" toward completion of the Talmage Road interchange improvements. The record establishes that the Talmage Road interchange improvements are being pursued by the city with or without the proposed project "because the improvements are required for the build out of the Redwood Business Park" and are "necessary to address future traffic deficiencies." While

14

mitigation measures adopted by the city require the city to actively pursue completion of the traffic improvements and condition Costco permits and approvals on the completion of the traffic improvements, the project does not "presume" or "legally compel" completion of the traffic improvements. Rather, the findings of overriding considerations establish that if, despite the city's best efforts, the traffic improvements are not completed and the traffic impacts remain unmitigated, the project nonetheless should be approved. Finally, the project and the Talmage Road Interchange Improvement project clearly have different proponents. While Costco agreed in its improvement contract with the city to guarantee any funds the city borrows to complete the transportation improvement "*if it fails to open its store for business or operate its business for at least 20 years,*" that guarantee is very different from an agreement to pay for the improvements outright.

For this reason, Citizen's reliance on *Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214 (*Tuolumne*) is misplaced. In that case, the City of Sonora issued a mitigated negative declaration for a shopping center project and undertook a separate CEQA review of road improvements that were required as a condition of approval for the shopping center. The court found that the road improvements should have been considered part of the proposed shopping center project because completion of the road realignment was included by the City of Sonora as a condition of approval for the project and the developer had committed to pay for the improvements. (*Id*. at pp. 1220, 1226, 1231.) In reaching its decision, the court in *Tuolumne* relied heavily on *Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712 (*Arcadia*). In that case, the court considered whether the construction of a shopping center, a parking lot, and improvements to an adjacent street were all part of a single CEQA project. (*Id*. at p. 726.) Ultimately, the *Arcadia* court found that the widening of the southern portion of the street, which was adjacent to the proposed project, was sufficiently related to the project to be considered part of the project. (*Ibid*.) However, the widening of the northern portion of the street as a result of a freeway expansion project for which environmental review had already been completed, was not part of the proposed project. (*Id*. at p. 727.) In *Tuolumne*, the court observed that the

15

difference between the northern and southern roadwork in *Arcadia* turned on two factors: "First, the city had determined long before the application for the zoning change that the completion of the freeway would require the widening of Baldwin Avenue. Second, the widening of the northern portion was a municipal capital improvement project, not a private project." (*Tuolumne*, *supra*, at p. 1225.) The road improvements in *Tuolumne* were more like the southern roadwork in *Arcadia* in that the approval of the home improvement center project was conditioned upon completion of the road realignment and the project proponent had committed to funding and completing the road realignment. (*Id.* at p. 1226.) The court observed that "[t]hese two similarities are more significant than the one similarity between the realignment of Old Wards Ferry Road and the widening of the northern portion of Baldwin Avenue—the long-existing plan for the work." (*Ibid.*) In contrast to *Tuolumne* and the southern road work in *Arcadia*, the Talmage Road Interchange Improvements are long-standing proposals that will be needed irrespective of the project completion and are not being paid for by the developer. Accordingly, the Costco EIR was not required to analyze environmental impacts to traffic and transportation caused by the Talmage Road Interchange Improvements.

Citizens also contends that the traffic impact analysis is insufficient because it does not include a trip distribution traffic study "specific to the Costco project" and instead relies on "an early trip distribution study for a nearby Walmart expansion project, which attracted customers from a much smaller geographic area." Citizens explains, "The census data for the Walmart expansion project and the Costco project are not similar. The economic study for the expanded Walmart showed the trade area to be limited by existing Walmarts in Lake and Sonoma counties and a general travel time of about 30 minutes. . . . [¶] In comparison to the location of nearby Walmart stores, the nearest Costco to the proposed Ukiah Costco is one hour to the south in Santa Rosa and 2-3/4 hours north in Eureka." As a result, the estimated population of the Costco trade area is more than 90,000 more than the population of the Walmart expansion project trade area and according to Citizens, "[a]lmost all of the additional 90,000 people within the Costco trade area live in areas north of Ukiah" so that they "would travel . . . south on U.S. 101

16

to access the Costco site." The city disputes Citizens' claim that the population data relied on in the formulation of trip distribution and volume was flawed. The city argues that "[t]he Costco trip distribution profile is the same as for the Walmart expansion project because both retailers draw from the same regional populations to the same shopping area (Airport Business Park) via the same, limited number of roadways and intersections." The city also argues that even with the increase in population in the Costco trade area suggested by Citizens, testing showed that with the proposed mitigation measures the levels of services at the impacted intersections will remain within an acceptable range.

Substantial evidence supports the population estimates utilized in the traffic study. Testimony by the traffic engineer before the city council established a reasonable basis for reliance on the population assumptions used in the Walmart project analysis: "[T]he development of the distribution assumptions where traffic goes to and from it's not a specific science, it's an art and science, takes a lot of human factors in to play as well as data and it's pretty common practice to utilize data that's available from other sources or data that's available from other nearby traffic studies. So yes we did start with the Wal-Mart traffic study assumptions. We did consider the new market study of the Costco project. We did consider what – how existing traffic from the Airport Business Park distributes out, how much goes to the freeway, how much goes to local streets. We did consider . . . when people go to a Costco especially from far away it's not a daily trip you're [going to] make, it's an outing. There's likely to be some of those trips that are [going to] use other – stop in other places in Ukiah since it is the county center to do other types of business so we [want to] take that into account." The engineer also explained that they performed additional tests after receiving Citizens' comments regarding the population of the trade area, and concluded that with the completion of the Talmage Road interchange improvements, the level of service for the impacted intersections would remain within acceptable levels, even assuming an increase in traffic to and from the North on U.S. 101.

17

Accordingly, despite the conflicting views contained in the record, there was no abuse of discretion with regard to the city's certification of the traffic and transportation section of the EIR.[6]

4.    *Noise Impacts*[*]

"The Legislature declared in CEQA that 'it is the policy of the state' to '[t]ake all action necessary to provide the people of this state with . . . freedom from excessive noise.' [Citation.] The Legislature further declared that it is the state's policy to '[r]equire governmental agencies at all levels to consider *qualitative* factors as well as economic and technical factors . . . .' [Citation.] Thus, through CEQA, the public has a statutorily protected interest in quieter noise environments." (*Keep Jets Over the Bay*, *supra*, 91 Cal.App.4th at pp. 1379-1380.)

The EIR describes the existing noise environment surrounding the project site as follows: "The project area is located in the Airport Industrial Park planned development, just south of the Ken Fowler car dealership. A medium density residential area lies north of Talmage Road. A mobile home park lies approximately 2000 feet west of the project site and across the airport runways. To the north lie a Furniture Design Center, Michaels, Staples, Food Maxx, and Friedman Home Improvement. The noise environment surrounding the proposed project site is influenced by traffic on US 101, air traffic at the Ukiah Municipal Airport, and local traffic associated with surrounding businesses. Noise levels retain a relatively high level due to the amount and proximity of traffic on US 101, the airport, and surrounding roads." The EIR identifies several land uses that are particularly sensitive to noise ("sensitive receptors") that are located near the project. "The nearest sensitive receptors are mobile-home residences located approximately 2,000 feet southwest from the project site. Sensitive receptors north of the project site that could

[6] Although Citizens' introduction states that it is challenging the sufficiency of the traffic analysis on the ground that "the EIR includes no evidence that the proposed traffic improvements are feasible and safe," Citizens has provided no argument in support of this contention. Thus, the argument has been forfeited.

[*] Part 4 is not certified for publication.  (See fn., *ante*, p. 1.)

18

be affected by traffic noise levels includes two hotels on the western side of Airport Park Boulevard (2,000 feet) and a residential community north of Talmage Road (3,000 feet)."

The EIR explains, "Most of the noise generated by the implementation of the project would be traffic-generated noise. The project would contribute to an increase in local traffic volumes, resulting in slightly higher noise levels along local roadways." The EIR concludes that traffic noise associated with the project is less than significant. [7]

"To assess the impact of project traffic on roadside noise levels, noise level projections were made using the Federal Highway Administration's . . . noise prediction model for roadway segments around the project site." A table in the EIR shows the existing noise levels at numerous locations around the project site and the predicted incremental increases in noise level with completion of the project both over existing levels and anticipated levels in the year 2030. The existing or baseline traffic noise shown in the tables is based on traffic volumes (as developed in the traffic study) during evening weekday peak-hours. Although some short and long term ambient noise measurements were taken and are included in the noise section of the EIR, those measurements were not used as a baseline for analyzing traffic noise impacts because, as the city explained, the measurements were "unattended and likely captured more than just roadway noise." [8] To predict any increase in traffic-generated noise caused by the proposed project, the city applied algorithms found in the Federal Highway Administration traffic noise prediction model to the projections of future traffic on the roadway from the traffic study. Following the comment period, the model was revised "to reflect correct speed limits on several of the roadways, and to estimate traffic noise on Airport Park Blvd south of Talmage at about 35 feet from the roadway centerline to better characterize noise at the two hotels in close proximity." As a result, "the baseline noise either increased or decreased slightly on

---

[7] The EIR also concludes that impacts from construction, grading and operational activities will all be less than significant. Citizens does not challenge these findings on appeal.

[8] Because those measurements were not used to establish the baseline to measure traffic noise impacts, it is not necessary to consider Citizens' arguments regarding the adequacy and location of those measurements.

the revised roadways depending on the corrected speed limit. However, the incremental change in noise after these model revisions would not change along the roadways."

Citizens contends that the traffic noise model used by the city "is so flawed as to be meaningless" and does not provide substantial evidence for the conclusion that the project will not have a significant impact on the noise environment. Citizens argues that the prediction model for a proper traffic noise study cannot be based solely upon data from the traffic study. Rather, traffic counts assertedly should be taken in conjunction with sound measurements and used in the model to determine if the predicted noise levels are the same as the measured levels. Citizens relies on its expert's opinion that "Caltrans in its 1998 Technical Noise Supplement (TeNS) requires field traffic counts to calibrate noise prediction programs, but traffic counts were not done nor was the model [used by the city] calibrated."[9] The expert explained, "An uncalibrated model makes the prediction of traffic inaccurate. This is particularly true at slower speeds where the Caltrans data is less accurate. Traffic data required to make a complete and accurate independent evaluation of the predictions cannot be done. Without an observer and field traffic counts during the sound tests, the influence of traffic volume, mix and speed are unknown and results in the uncalibrated model."

The city disputes that the failure to calibrate its model in conformity with TeNS renders the results of its noise study inaccurate or unreliable. The city emphasizes that "[d]isagreements among experts does not make an EIR inadequate. [Citations.] Technical perfection is not required; we look not for an exhaustive analysis but for adequacy,

---

[9] Section N-3120 of the TeNS manual describes "model calibration" as follows: "Noise measurements near highways or other transportation corridors are routinely used to calibrate the computer models by comparing calculated noise levels with actual (measured) noise levels. The calculated levels are modeled results obtained from traffic counts and other parameters recorded during the noise measurements. The difference between calculated and measured noise levels may then be applied to calculated future noise levels assuming site conditions will not change significantly, or modeled existing noise levels (see sections N-5400 and N-5330). Obviously, model calibration can only be performed on projects involving existing highways." (<http://www.dot.ca.gov/-hq/env/noise/pub/Technical%20Noise%20Supplement.pdf> [as of June 21, 2016].)

completeness, and a good-faith effort at full disclosure." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 371-372.)

In responding to a comment to the draft EIR, the city's expert expressly rejected the claim that calibration according to the TeNS Manual is required. The city's expert explained, "The commenter appears to hold the TeNS Manual as the concrete framework for noise analyses and suggests that impacts that do not follow its guidance are flawed. However, the TeNS Manual was cited in the DEIR as reference to general concepts pertaining to noise, such as general attenuation rates, but was not used as the basis for impact significance. TeNS is not a requirement for adequate analysis under CEQA. As stated in the 1998 TeNS Manual on page N-1, specifically the underlined text . . . : [¶] 'The purpose of this [supplement] is to provide technical background information on transportation-related noise in general and highway traffic noise in particular. It is designed to elaborate on technical concepts and procedures referred to in the Caltrans traffic noise analysis protocol . . . . The contents of this supplement are for informational purposes only and unless specifically referred to as such in the protocol they are not official policy, standard or regulation.' " The city points out that as recognized in its general plan, the Federal Highway Administration model used in the noise study "is the analytic method presently favored for traffic noise prediction by most state and local agencies, including Caltrans." The general plan explains, "Noise modeling techniques use source-specific data including average levels of activity, hours of operation, seasonal fluctuations, and average levels of noise from source operations. Modeling methods have been developed for a number of environmental noise sources including roadways, railroad line operations, railroad yard operations, industrial plants and airports. *Such methods produce reliable results as long as data inputs and assumptions are valid.*" (Italics added.)

Citizens does not challenge the validity of the traffic counts that were inputted into the model for this study. The assumptions, including applicable speed limits, were adjusted for a more accurate location specific prediction. Although calibration might have increased the reliability of the results, the noise study was sufficient to inform the public

21

and decision makers as to the significance of the incremental increase in traffic-generated noise caused by the proposed project. The city did not abuse its discretion in relying on the study in certifying the EIR.

Citizens also contends that the EIR fails to identify and evaluate potentially significant impacts to sleep disturbance for hotel guests as a result of the project's increased truck traffic. Citizens acknowledges that the EIR evaluated project impacts on interior noise levels at the hotels and concluded that the impact would be less then significant. Citizens argues, however, that the EIR failed to separately analyze "the impact of substantial temporary or periodic increases in sound levels caused by Costco heavy trucks passing three transient living quarters along Airport Park Boulevard." Citizens relies on *Keep Jets Over the Bay*, *supra*, 91 Cal.App.4th at page 1382, in which the court concluded that the EIR improperly omitted significant information about the project's potential interference with sleep, including physiological response and annoyance from increased nighttime overhead flights. The court rejected the standard of significance applied in the EIR under which all residential uses were deemed compatible with a particular noise level, and thus not significant, regardless of the change in noise level caused by single-event sounds. (*Id*. at pp. 1380-1381.) The court explained that "[t]he probability of being repeatedly awakened by multiple single-event sounds can be calculated, given sufficient data" and that further study was needed addressing the impact of single-event noise. (*Id*. at p. 1382.)

As the city argues, however, "[f]undamentally, there is a significant difference between a delivery truck traveling down a major boulevard that already contains cars and trucks (the roadway being a continuous noise source) and the noise produced by jet engines, particularly when flying overhead (which is akin to a discrete source.)" In addition, unlike the situation in *Keep Jets Over the Bay, supra*, 91 Cal.App.4th at page 1372, where the project was estimated to add an additional 73 nighttime flights each day, the delivery hours for Costco are generally limited to 4:00 a.m. through 2:30 p.m. and approximately 50 to 100 trucks are expected in an average week. The city's experts reasonably concluded that "[t]he addition of Costco trucks is not expected to result in

22

significant sleep-disturbing impacts at the hotels since nighttime deliver[ies] already occur on Airport Park Boulevard for the existing commercial uses (such as Walmart) and are part of the existing noise environment."

Finally, Citizens contends that the finding in the EIR that the project will not have a significant impact on the noise environment is inconsistent with the standard of significance set forth in the EIR and that set forth in the city's general plan. Relying on standards recommended by the Federal Interagency Commission on Noise (FICON), the EIR provides: "Where background noise levels without the project would be less than 60 dB Ldn,[10] a 5 dB or greater noise level increase due to the project would be considered significant. Where background noise levels without the project would exceed 65 dB Ldn, a 1.5 dB or greater noise level increase due to the project would be considered significant. This graduated scale is based on findings that people in quieter noise environments would tolerate larger increases in noise levels without adverse effects, whereas people already exposed to elevated noise levels exhibited adverse reactions to noise for smaller increases." The EIR also states that traffic noise levels that "exceed the city's 60 dB Ldn exterior and/or 45 dB Ldn interior noise exposure limits" may be considered significant. The city's general plan sets the maximum allowable noise exposure to transportation noise sources for transient lodging at 60 dB Ldn for outdoor areas and 45 dB Ldn for indoor areas. The general plan provides, however, "Where it is not possible to reduce noise in outdoor activity areas to 60 [dB Ldn] or less using practical application of the best-available noise reduction measures, an exterior noise level of up to 65 [dB Ldn] may be allowed provided that available exterior noise reduction measures have been implemented and interior noise levels are in compliance with this table."

The applicable table, as revised in the final EIR, shows that because the existing noise level on the roadway segment where hotels are located is 65.1 db and the incremental increase with the project is 3.1 db, the projected impact is potentially

---

[10] "dB" refers to decibels. "Ldn" is a composite 24-hour average noise level.

significant. The EIR explains, however, that although this noise level is "potentially significant on the face of it, the fact that the building is for transient/temporary lodging (i.e., patrons would not experience a significant change in the noise environment since they are not long-term residents) rather than residential units, and the general plan recognizes that external noise exceedances may be acceptable if the internal level of 45 dB[] is maintained, the noise level increase was determined to result in a less than significant impact. The exterior noise level already exceeds the general plan standards, under existing conditions . . . . The FICON standards were used to identify potentially significant increases for receptors. The interior noise levels were considered, with a standard of 45 dB[] (a standard reflected in both local policy and state building regulations). Residential uses, in contrast to hotels, are more affected by outdoor noise (which is reflected in the general plan language allowing higher exterior noise levels if the interior noise standard of 45 dB[] is maintained). . . . [T]he 45 dB[] interior noise level is maintained, and the impact was therefore considered less than significant." The city's conclusion that the noise level increase does not result in a significant impact, despite exceeding FICON standards, is reasonable under the circumstances. The existing exterior noise level already exceeds the limit prescribed in the general plan and the interior sound levels remain within the noise parameters of the general plan. Although, as Citizens points out, the general plan does not "distinguish noise standards applicable to transient lodging as opposed [to] residential land uses," the reasoning in the EIR is entirely sensible: to transient hotel guests, unlike residential inhabitants, the interior sound level is far more important than the exterior noise level. Thus, because the interior noise level after the project will remain within an acceptable limit, the EIR was justified in concluding that the noise impacts of the project will be less than significant.

5.    *Zoning Impacts*[*]

Citizens contends that the rezoning of the project parcels from industrial/auto-motive commercial and light manufacturing/mixed use to retail commercial is

_____

[*] Part 5 is not certified for publication.  (See fn., *ante*, p. 1.)

24

inconsistent with the Airport Industrial Park (AIP) specific plan adopted on January 21, 1981. The city does not dispute the inconsistency, but argues that "the AIP specific plan was never properly adopted and, even if it had been, it was superseded by the 1995 Ukiah general plan with which the project is consistent."

The AIP specific plan was adopted by the city in January 1981.[11] In March 1981, the city approved a use permit for the AIP planned development. In 1992, the city adopted a resolution converting the use permit for the AIP planned development to an ordinance. The ordinance includes text and diagrams specifying the distribution, location and extent of land uses, specific development standards, prohibited uses, required public utility easements, street design standards, signage requirements, design guidelines, landscaping and open space requirements, and discretionary permit review requirements. Section four of the ordinance indicates that the planned development "provides a mixture of industrial and commercial uses within a planned development . . . , consistent with the [city's] general plan, as amended, which allows said mixture, and which is accordingly shown on the [city's] general plan land use map for the subject assessor's parcels."[12]

In 1995, the city adopted a new general plan. The new plan provides that it is the policy of the city to utilize "master plan areas" to meet precise planning needs. The general plan explains, "*Master plan areas* are a new classification in the Ukiah Valley. Master plan areas are intended to cover lands proposed for 'specific plans,' 'area plans,' or as 'planned unit developments.' A specific plan is called out in California law as an adopted plan that provides precise development standards and policies for an area of land.

---

[11] For purposes of this discussion, we shall assume the 1981 specific plan was properly adopted, although the city disputes this assumption.

[12] According to 7 Miller & Starr, California Real Estate (4th ed. 2015) section 21:9 at page 21-53, "planned development zoning" is a planning tool that "allows for variations of uses and standards in accordance with an overall master plan without the uniformity in density and overall development patterns that result from traditional zoning. Planned development zoning is usually based on a broad description of allowable uses that is subject to detailed land use planning and implemented by a master development plan that is adopted either as an ordinance or as a development plan permit much like a conditional use permit."

State law specifies what must be included in a specific plan. Sometimes a private developer, the city, or county would prefer to have a less precise development proposal to be considered for adoption. The role of the master plan area is to permit an area within the Ukiah Valley to be designated for more precise, site specific studies prior to approving subdivisions or other uses." (Fn. Omitted.) "The master plan area land use classification is to be applied to the parcels contained within a master plan or a specific plan at the time of adoption by the city or county." The general plan indicates that the city had previously approved a "master plan" for the AIP. According to the planning department, the general plan "designated the AIP as a 'master plan' area with the knowledge it had already adopted a precise planned development ordinance regulating growth and development within the AIP."

After adoption of the general plan and prior to the approval of the project in this instance, the city at least three times amended the AIP planned development ordinance to modify the permitted land uses in the designated area and to reflect those allowable uses on the generalized land use map. Each amendment includes the statement that "the AIP planned development is consistent with the 'master plan' land use designation for the property contained in the [city's] general plan" or that the AIP planned development is "consistent with the [city's] general plan." No amendment makes reference to the 1981 AIP specific plan.

From this record, it appears that although the AIP specific plan was not expressly repealed, the city intended, and operated as if, the AIP planned development ordinance was the operative "master plan" for the AIP master plan area at the time the general plan was adopted. As noted above, the general plan provides that a planned development may serve as a master plan for a designated master plan area. While the general plan states that "specific plans . . . may be substituted for master plans *when it is the preferable planning program,*" nothing in the general plan requires adoption of the AIP special plan

26

as the master plan for the AIP master plan area.[13] According to the general plan, "master plans shall be adopted utilizing the same process as a general plan amendment." The AIP planned development was adopted first by resolution then by ordinance that was "published as required by law" and became "effective 30 days after its adoption." Although the record before this court does not establish that a public hearing was held on the AIP planned development prior to its adoption, we must presume that the city complied with the applicable statutes. There is no dispute that the project is consistent with the general plan and the AIP planned development ordinance.

### Disposition

The judgment is reversed and the matter remanded to the trial court with instructions to grant Citizens' petition for a writ of mandate directing the city to set aside its certification of the final EIR and approval of the project and to bring the energy section of the EIR into compliance with CEQA before redetermining whether to approve the project. The judgment is affirmed in all other respects. Citizens shall recover its costs on appeal.

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Jenkins, J.

_____

[13] To the contrary, a provision in the general plan stating that the "Lovers Lane Specific Plan" shall be identified on the land use map as the "Lovers Lane Master Plan Area" supports the inference that if the city intended the 1981 AIP specific plan to substitute for the master plan for the AIP master plan area, it would have done so expressly.

Trial court:                                    Mendocino County Superior Court

Trial judge:                                    Honorable Jeanine Nadel

Counsel for plaintiff and appellant:            KOPPER & MORGAN, William D. Kopper.


Counsel for defendant and                       RAPPORT AND MARSTON, David J. Rapport
respondent:                                     Armbruster Goldsmit & Delvac LLP, Damon P.
                                                Mamalakis, Dale J. Goldsmith

A145581